### KINCAID v. UNITED STATES. *

District Court, W. D. Louisiana, Monroe Division.   August 13, 1929.

No. 355.

*For opinion on the merits, see 36 F. (2d) —.

Wm. C. Dufour, John St. Paul, Jr., and T. J. Freeman, all of New Orleans, La., Harry H. Russell, of Monroe, La., C. J. Ellis, of Rayville, La., and Streett & Burnside, of Lake Village, Ark., for plaintiff.

Philip H. Mecom, U. S. Atty., of Shreveport, La., J. D. Modisette, Sp. Asst. U. S. Atty., of Jennings, La., and John C. Dyott, Sp. Asst. U. S. Atty., of St. Louis, Mo.

DAWKINS, District Judge. This is a suit in equity against the United States, the Secretary of War, Chief of Engineers, the

Mississippi River Commission, and its individual members, and the district engineer in charge of work in this district, to enjoin the construction of certain levees and other works contemplated by the Act of Congress approved May 15, 1928, 70th Congress, Pub. No. 391, commonly known as the Flood Control Act (33 USCA §§ 702a–702m, 704).

The plaintiff alleges that he is the owner in fee simple of 160 acres of land, with improvements thereon of the value of $9,000, situated between the levees to be constructed on either side of the Bœuf river basin and within the channel through which a portion of the waters from the main stream of the Mississippi river will be diverted at flood stage by what is called a "fuse plug" outlet, located just below Arkansas City, in the state of Arkansas; that the purpose is to use this basin as a diversion channel to lower the level of water in the Mississippi river and to carry it into Red river at or near the head of the Atchafalaya; that the effect will be to relieve the pressure on the main levees and to protect property on both sides of the Mississippi from Cape Girardeau, Mo., to the Passes, as a part of the adopted project to control flood waters in the Mississippi valley, and that it is not intended in any way for the benefit of the property within said floodway or diversion channel, but on the contrary, the same will be destroyed and rendered valueless. The plaintiff further alleges as follows:

"The water that will flow into the Bœuf floodway or diversion channel will all be diverted from the main channel of the Mississippi river. The main levee of the Mississippi river at this point will be retained, but will be raised above and below so that, at this point, it will be lower than the levee above and below, and will constitute what Major General Jadwin terms in his report as a fuse-plug levee. The purpose of leaving this levee lower, or creating a fuse-plug levee, is solely for the purpose of having the water break over same at flood tide and flood this diversion channel or floodway. In other words, it is an uncontrolled spillway. Guide levees are to be constructed on each side of this basin. The width of the basin between the guide levees will be from approximately eight to eighteen miles wide, extending from Cypress creek to the Red river. The construction of these guide levees will have the effect of making a floodway or pocket for the flow of water intentionally diverted from the Mississippi river through this diversion channel, and this diverted water will have the effect of destroying the value of all property situated within the flood area. The project adopted by Congress in the Flood Control Act of May 15, 1928, specifically set apart this diversion channel or floodway as a part of the project, and, as stated above, the said agents of the government are now proceeding to construct the guide levees, so as to inclose this diversion channel and specifically define its boundaries and is designedly making this channel a floodway or diversion channel. The government, through its agents, the Secretary of War, Major General Jadwin, and the Mississippi River Commission, has publicly announced, and it is a notorious fact, that the property in this diversion channel is to be used as a floodway, and the Secretary of War, acting through Major General Jadwin, Chief Engineer, is, at this time, advertising for and receiving bids for the construction of the guide levees to enclose this channel which will have the effect of fixing the bounds of this diversion channel and floodway, and at floodwater it is intended by the use of what the government designates as fuse plugs or low places in the main levee, to flood this entire channel so fixed and designated by them as such, the lands and properties located between the guide levees and the main levee to be the floor of the floodway or diversion channel."

He also alleges that his said land is at this time in a high state of cultivation, and has thereon his residence and other valuable buildings; that it now lies back of the Mississippi river levees, and is protected at all times from the waters of that river, "if the levees hold"; that if the proposed plan is carried out it is purposely intended that his property, with that of others, will form the bed of said diversion channel and serve as a storage basin for waters of the Mississippi, making it wholly unfit for farming, for which it is solely valuable; that this will in effect be the taking of petitioner's property by the government without due process of law and without just compensation, contrary to the Fourteenth and Fifth Amendments to the Federal Constitution; and that defendants are now advertising for bids for the construction of said guide levees, and unless restrained bids will be received and contracts let therefor in due course.

It is also further alleged as follows:

"That the acts of the defendants in setting apart this property as a floodway and diversion channel and in advertising for and receiving bids for the doing of the proposed work, to wit, the construction of the guide levees and the contemplated acts of the defendants in the awarding of contracts there-

for, has already had the effect of casting a cloud upon the title of complainant to his said lands and properties and have materially affected his use and enjoyment of same, and have materially affected and impaired the value thereof. That, the result of setting apart this area as a floodway or diversion channel and the publication by defendants of said advertisements for bids for the construction of the guide levees, this property has not only deteriorated in value, but complainant's title to same has been seriously clouded, his use of same has been seriously affected, and complainant would be unable to borrow money on said lands, sell or dispose of same, or interest persons in operating said lands for farms or for any other purpose, owing to the fact that the Government has indicated that it has taken possession or intends to take immediate possession of this property for a diversion channel or a floodway. That, as a result of making this area, in which complainant's lands and those of others are situated, a floodway or diversion channel, these lands will be rendered unfit for agricultural or any other purpose. That the title to complainant's lands is seriously clouded by said acts, and his ability to use said properties or obtain credit thereon is seriously affected, and, as stated above, this property is well worth the sum of $9,000.

"Complainant would further state: That although the Flood Control Act of May 15, 1928, § 4 [33 USCA § 702d] above recited, and the Constitution of the United States, Fifth Amendment, which provides: ' * * * Nor shall any person * * * be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation'—require the United States government to justly compensate complainant for his property taken, damaged, or destroyed, the defendants herein are not complying in any way either with the constitutional provision or with the provision of section 4 of the Flood Control Act. Without having obtained complainant's property, without having commenced any condemnation proceeding, they are proceeding to take over property in this area, inclose same with levees, and designedly overflow same during floodwater. That no condemnation proceeding has been commenced against complainant for this property, no compensation has been paid him or offered him, but the said agents of the United States government are seeking to award contracts for the immediate construction of the guide levees and to make a diversion or floodway channel in this area. That

the damage to this complainant will be irreparable. That it is a well-known fact that any suit against the United States to recover money for damages or property is subject to interminable delays and is very expensive.

"Complainant would further state that if said contracts for the guide levees are awarded before complainant has been compensated for his property or secured in the payment of compensation for same, the contracts would involve such large sums that complainant would be unable to give bond sufficient to enjoin same and thus protect his property from confiscation by reason of the proposed unlawful acts of the defendants. That complainant has no remedy at law and if said contracts are awarded he will immediately suffer irreparable injury and loss. Complainant would further state that under section 4 of the Flood Control Act of May 15, 1928, it is provided that the Secretary of War may cause proceedings to be instituted for the acquirement by condemnation of any lands, easements, or rights of way which, in the opinion of the Secretary of War and the Chief of Engineers, are needed in carrying out this project. The Secretary of War and the Chief of Engineers have already agreed and notoriously announced that property in the Bœuf floodway or area is necessary to carry out the project. The said section 4 provides that 'when the owner of any land, easement, or right of way shall fix a price for the same which, in the opinion of the Secretary of War is reasonable, he may purchase the same at such price.' Complainant has never fixed a price upon his land, nor donated or conveyed same to the government, nor has the Secretary of War tendered to him any price for same, nor has any condemnation proceeding been commenced to acquire same.

"The said act further provides, in section 4 [33 USCA § 702d], that if condemnation proceedings are commenced to obtain properties which, in the opinion of the Secretary of War and the Chief of Engineers, are needed to carry out the project, the proceedings will be under the provisions of sections 5 and 6 of the River and Harbor Act of July 18, 1918 [33 USCA §§ 594, 595]. Section 5 of that act expressly provides that before the United States can acquire possession of property it shall first file its petition for condemnation, after which it shall have the right to take immediate possession of said lands and proceed with the public works thereon only on the following condition: 'That certain and adequate provision shall have been made for the payment of just compensation to the

party or parties entitled thereto, either by previous appropriation by the United States or by the deposit of moneys or other form of security in such amount and form as shall be approved by the court in which such proceedings shall be instituted.'

"The defendants herein are undertaking to take possession of complainant's property without first filing a condemnation suit or without first purchasing same from him. That the construction of the guide levees will, in effect, be taking possession of complainant's property by the United States government without just compensation to complainant."

Plaintiff prays that the defendants be enjoined from carrying out any of the work of the said Bœuf river floodway, and pending hearing that a restraining order issue, prohibiting them from awarding contracts or building said levees, and for general relief.

The restraining order was denied, but, in view of the importance of the case, counsel for the government were called in and informed of the presenting of the petition. It was suggested that the defendants prepare to meet the issues promptly, so that the courts might make a conclusive decision of the questions involved with as little delay as possible. Thirty days were allowed for this purpose, and the time was extended for an additional week at the request of counsel for the defendants.

On the day of the hearing the defendants filed a motion to dismiss upon the following grounds:

"(1) That this court is without jurisdiction.

"(2) That the United States is a sovereign power and cannot be sued without its consent.

"(3) That a suit against the other defendants is in effect a suit against the United States, and that an official of the government of the United States cannot be sued when there is no personal judgment sought against him and he has no personal interest in the matter involved.

"(4) That the court has no jurisdiction under the bill of complaint.

"(5) That there is a misjoinder of parties defendant herein.

"(6) That it appears from the bill of complaint, with the exception of the United States, that the respondents therein named are not acting in a personal or individual capacity, or engaged in the performance of any act or acts other than those prescribed by the laws of the United States and all of their acts are official and as the representatives of the United States.

"(7) That the complainant is not entitled to relief in equity inasmuch as he has a plain, adequate and complete remedy at law.

"(8) In the alternative, and only in the alternative, should the court overrule this motion to dismiss for all of the above and foregoing reasons, then and in that event respondents show that the said bill of complaint discloses no cause of action or no right of action."

In reality there are only four points raised: (1) Grounds 1, 2, 3, 4, and 6 set up the want of jurisdiction, because it is claimed the case is one against the government, which has not given its consent to be sued. (2) No. 5 is a plea of misjoinder of parties defendant. (3) No. 7 asserts that the bill discloses no ground for equitable relief, for petitioner has an adequate remedy at law. (4) While specification No. 8 is a plea of no cause or right of action.

█ It will be noted that the motion does not challenge the venue of this court, upon the ground that the defendants are not domiciled within its territorial limits, and the general appearance made amounts to a waiver of that question. Lee v. Chesapeake & Ohio, 260 U. S. 656, 43 S. Ct. 230, 67 L. Ed. 443.

█ Counsel for petitioner rely upon paragraph 20 of section 24 of the Judicial Code (28 USCA § 41 (20), as authorizing the making of the United States a party to this suit. The theory advanced is that, since the government has the right to condemn plaintiff's property for the purpose for which it is to be used, its course amounts to a taking under the Fifth Amendment, entitling him to claim compensation as upon an implied contract, of which this court has jurisdiction concurrent with the Court of Claims for sums not exceeding $10,000. However, the plaintiff asks for no such relief, which would be in the nature of a suit at law, but has appealed to the equity side of this court for an injunction, upon the ground that his property is to be taken contrary to the Constitution, as well as the particular statute under which the work is proceeding.

It is well to note that the plaintiff does not assert, and in argument expressly denies, that he intends to question the constitutionality of the Flood Control Act. I construe his position as asserting that the defendants are proceeding in the face of both the statute and the Constitution. In this situation I do not think the government, as such, can be or need be a party defendant. One test

would be to answer the query as to whether it might in this identical proceeding, if it saw fit, file a cross-bill for condemning the property. It seems clear that it must be answered in the negative, for such an action would be necessarily controlled by the statutory provision for exercising the powers of eminent domain, and could not be classed as a proceeding in equity. Of course, the action, for its own purposes, admits the allegation of ownership of the property in plaintiff, and there is, therefore, no issue of title to be determined against the United States, which would make it a necessary party within the purview of decisions cited by counsel for defendants, such as United States v. Clarke, 8 Pet. 436, 8 L. Ed. 1001; Hill v. U. S., 149 U. S. 593, 13 S. Ct. 1011, 37 L. Ed. 862; Morrison v. Work, 266 U. S. 481, 45 S. Ct. 149, 69 L. Ed. 394.

This bill also necessarily admits the power of the government to take the property, or the rights thereon, which the project contemplates using as part of the floodway. The only effect of this suit is to restrain the officers charged with the execution of the works, which he alleges will consign his property to that use, until they have complied with what the plaintiff contends is the required procedure under the statute. Hence I think it may be classed as in the nature of a proceeding in ejectment or to restrain a trespass against the Mississippi River Commission and the individual officers named as defendants. See Belknap v. Schild, 161 U. S. 18, 16 S. Ct. 443, 40 L. Ed. 599; American School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 S. Ct. 33, 47 L. Ed. 90; Santa Fé Pac. R. R. Co. v. Lane, 244 U. S. 492, 37 S. Ct. 714, 61 L. Ed. 1275; Waite v. Macy, 246 U. S. 606, 38 S. Ct. 395, 62 L. Ed. 892; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; First National Bank of Canton v. Williams, 252 U. S. 504, 40 S. Ct. 372, 64 L. Ed. 690; Ft. Smith & Western Railroad Co. v. Mills, 253 U. S. 206, 40 S. Ct. 526, 64 L. Ed. 862; Street v. Lincoln Safe Deposit Co., 254 U. S. 88, 41 S. Ct. 31, 65 L. Ed. 151, 10 A. L. R. 1548; Tedrow v. Lewis & Son Dry Goods Co., 255 U. S. 98, 41 S. Ct. 303, 65 L. Ed. 524; Kennington v. Palmer, 255 U. S. 100, 41 S. Ct. 303, 65 L. Ed. 528; Kinnane v. Detroit Creamery Co., 255 U. S. 102, 41 S. Ct. 304, 65 L. Ed. 531; Weed & Co. v. Lockwood, 255 U. S. 104, 41 S. Ct. 305, 65 L. Ed. 532; Willard Co. v. Palmer, 255 U. S. 106, 41 S. Ct. 305, 65 L. Ed. 534; International R. Co. v. Davidson, 257 U. S. 506, 42 S. Ct. 179,

66 L. Ed. 341; Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822; Lipke v. Lederer, 259 U. S. 557, 42 S. Ct. 549, 66 L. Ed. 1061; Regal Drug Co. v. Wardell, 260 U. S. 386, 43 S. Ct. 152, 67 L. Ed. 318; Chastleton v. Sinclair, 264 U. S. 543, 44 S. Ct. 405, 68 L. Ed. 841.

Plaintiff in substance charges that the conduct of these defendants has cast a cloud upon the title to his property, which has and will deprive him of its value without due process and contrary to the Fifth Amendment. Under such circumstances the authorities abundantly support the right to make them parties defendant to such a suit as this. Noble v. Union River Logging R. R. Co., 147 U. S. 165, 13 S. Ct. 271, 37 L. Ed. 123; Lane v. Watts, 234 U. S. 525, 34 S. Ct. 965, 58 L. Ed. 1440; Payne v. Central Pac. Ry. Co., 255 U. S. 228, 41 S. Ct. 314, 65 L. Ed. 598; Payne v. New Mexico, 255 U. S. 367, 41 S. Ct. 333, 65 L. Ed. 680; Santa Fé Pac. R. R. Co. v. Fall, 259 U. S. 197, 42 S. Ct. 466, 66 L. Ed. 896; Baldwin Co. v. Robertson, 265 U. S. 168, 44 S. Ct. 508, 68 L. Ed. 962.

My conclusion is, therefore, that the government should be dismissed from the suit. This disposes of the question of jurisdiction as well as the plea of misjoinder, which consists of the assertion that the suit is one against the government and that the officers are without interest and hence improperly joined.

We next take up the remaining specifications, want of equity and no cause or right of action. I shall dispose of the latter question first. At this point it is well to say that, in the opening argument, counsel for the defendants discussed and appeared to rely mainly upon the proposition that the government has the right to impose the burden complained of upon the property of plaintiff as a matter of sovereign power, and the injury, if any, is so remote and consequential as to fall within the class damnum absque injuria. On the other hand, counsel for the plaintiff undertook to discuss the merits of the case, as presented by the petition, of whether the project amounted to a taking of property within the meaning of the Fifth Amendment. The court suggested that, in the event it should decide the other points hereinabove considered, as well as the one of want of equity, were not well taken, it would not care to dispose of the important question of what constituted property or amounted to a taking within the meaning of the law, except after a full hearing of the facts; one reason among others being that, if it should err, the result would be to have the

case sent back after the delays incident to an appeal, and thus unnecessarily impede the doing of the work. In other words, it was important that both the government and property owners should know what their rights were at the earliest possible moment consistent with proper judicial consideration.

From earliest times man has attempted to cultivate the rich soils in the valleys and on the banks of water courses. From this struggle with the elements the rule evolved that every one has the right to protect his property with dikes or levees to keep back such waters, without being responsible to his neighbors or to owners on the other side of the stream. It was recognized that they have the equal right to protect themselves by similar means. See discussion and citation of authorities by Judge White, in Cubbins v. Mississippi River Commission, 241 U. S. 363, 364, 36 S. Ct. 671, 60 L. Ed. 1041. On the other hand, there grew with the doctrine another of equal force, that "the free flow of water in rivers was secured from undue interruption, and the respective riparian proprietors, in consequence of their right to enjoy the same, were protected from undue interference or burden created by obstructions to the flow, by deflections in its course, or any other act limiting the right to enjoy the flow or causing additional burdens by changing it." The court reviewed the law, including the commentators upon the Code Napoléon, and quoted the maxim of the Roman law: "Fluminis naturalem cursum non avertere." L. 1, Cod. do Alluvionibus. 241 U. S. 364, 36 S. Ct. 674.

It follows that, if the private individual who constructs a levee for the protection of his own property, so long as he does not interfere with the natural flow of the stream, is not liable to others for the effects thereof, neither is the government, the state, levee boards, or other similar agencies, who contribute to or assume control of such works for the benefit of the public. See Jackson v. U. S., 230 U. S. page 1, 33 S. Ct. 1011, 57 L. Ed. 1363; Hughes v. U. S., 230 U. S. page 24, 33 S. Ct. 1019, 57 L. Ed. 1374, 46 L. R. A. (N. S.) 624. It is well settled that Congress, under the commerce clause of the Constitution, has the right to authorize construction of improvements upon and in the navigable streams and water courses of the country in aid of navigation, so long as it is done without impeding or diverting the flow from the natural channel, without liability for consequential damages or injuries to private property. Bedford v. U. S., 192 U. S. 217, 24 S. Ct. 238, 48 L. Ed. 414.

For a description in general terms of the situation now to be dealt with, no better statement could be made than that of Justice White in Jackson v. U. S., 230 U. S. 1, at page 3, 33 S. Ct. 1011, 1012, 57 L. Ed. 1363, from which I quote as follows:

. "The valley of the Mississippi river may in a broad sense be said to commence at Cape Girardeau, Mo., and to extend from there to the mouth of the river at the Gulf of Mexico. The river, however, in its course to the ocean, does not run through the center of the vast fertile and alluvial plains which, in a comprehensive and generic sense, constitute the delta of the Mississippi. On the contrary, the situation of the river in this respect varies, occasioned by the fact that, at divers places, the upland or hill country approaches to or constitutes the bank of the river. The difference in this regard is marked between the west and east banks. The west bank is divided into four great basins—the St. Francis Basin, which extends from Cape Girardeau to Helena; the White River Basin, which extends from Helena to the mouth of the Arkansas; the Tensas Basin, which extends from the mouth of the Arkansas to the mouth of the Red River; and the Atchafalaya Basin, extending from the mouth of the Red River to the Gulf. Practically in the long sweep from Helena, where St. Francis Basin ends and the White River Basin begins, to the ending of the Atchafalaya Basin at the Gulf, there is no real topographical distinction between the basins, the west bank of the river in that great distance consisting of alluvial country having generally a very wide though varying expanse. The division into basins, putting out of view the St. Francis Basin, is therefore merely the result of a consideration of the watershed of each basin, all the water, however, from each ultimately finding its way to the Gulf of Mexico, either through the Mississippi river, or in the lower basins in part, at least, by the means of streams flowing independently of the Mississippi river to the Gulf of Mexico. On the east bank the situation is different. In the long stretch from Cairo, Ill., to a point a short distance below Memphis, generally speaking, the hills and uplands border the river and constitute its bank. From the point below Memphis to which we have referred, to Vicksburg, Miss., this is not the case, and there is a great basin known as the Yazoo

Basin, which, aside from peculiarities of its own, may be said to possess the same general characteristics as the basins on the west bank of the river. From Vicksburg, where the uplands come to the river and constitute its bank, down to Baton Rouge, La., where the hills or uplands permanently recede from the river, a different condition from that which exists on the west bank obtains."

By the Act of June 28, 1879 (21 Stat. p. 37, 33 USCA § 641 et seq.), the Mississippi River Commission was created and empowered to direct and complete such surveys of the Mississippi between the head of the Passes near its mouth to its headwaters, as were then in progress, and to make such additional "surveys, examinations and investigations, topographical, hydrographical, and hydrometrical, of said river and its tributaries, as may be deemed necessary by said commission to carry out the objects of said act." Section 3, 33 USCA § 647. It was further required to make report to Congress of any "such plan or plans as will correct, permanently locate and deepen the channel and protect the banks of the Mississippi river; improve and give safety to the navigation thereof; prevent destructive floods; permit and facilitate commerce, trade and the postal service: provided that the commission shall report in full upon the practicability, feasibility and probable cost of the various plans known as the jetty system, levee system, and the outlet system, as well as upon such others as they may deem necessary." For the purposes mentioned an appropriation of $175,000 was made. Three years later, in 1882, the great overflow of that year, with considerable damage to the alluvial valley, occurred, and on March 1st Congress made an appropriation of $150,000 to furnish food for the destitute population. 22 Stat. 379.

In August, 1882, in the Rivers and Harbors Bill of that year, there was appropriated $4,000,000, to be expended from the head of the Passes to Cairo, but it was expressly stipulated that "no portion of this appropriation shall be expended to repair or build levees for the purpose of reclaiming lands or preventing injury to lands by overflows: Provided, however, that the commission is authorized to repair and build levees, if in their judgment it should be done, as a part of their plan to afford ease and safety to the navigation and commerce of the river and to deepen the channel." 22 Stat. 208. Thereafter provision was made from time to time to aid and assist the Valley states and their subordinate agencies in the construction of levees. Many held to the theory that this would have the effect of increasing the flow, deepen the channel, and give more room for the outlet of flood waters according to the method used by Capt. Eads, who constructed the jetties at the mouth of the river.

In the suit of Cubbins v. Mississippi River Commission, supra, the petitioner in that case, who also demanded compensation for alleged injuries to property from the waters of the Mississippi, assailed the "Eads plan" in somewhat similar fashion to what we have heard of the more recent one. It will be noted that at the time Congress sought to make plain, at least in the beginning of the activities of the commission, that its purpose was to aid commerce, the postal service, etc., by the improvement of navigation, but expressly declared that the funds appropriated should not be used to reclaim lands or prevent injury by floods. This then appeared to be the definite policy of the government. I have not the time to trace subsequent legislation, to determine whether the change of policy came about gradually or not, but 45 years later occurred the great flood of 1927, which in size, destruction of property (officially estimated at over $200,000,000), and loss of human life (also stated to have been more than 200 persons) surpassed anything that had gone before. As a result pressure was put upon Congress, through Representatives and Senators, not only of the states immediately contiguous to the Mississippi, but in others, including those along its tributaries, to provide relief, because it so happened that in that year all of those streams, such as the Ohio, Missouri, Tennessee, Arkansas, White, and Red, were full to overflowing at approximately the same time.

Finally, after a survey and report by the Chief of Engineers, which was printed as House Document No. 90, the Act of May 15, 1928 (33 USCA §§ 702a–702m, 704), was passed. That report or project also consisted of a review, from an engineering standpoint, of a number of plans for controlling the waters of the Mississippi river proper, or the volume to be dealt with under flood conditions from Cape Girardeau, Mo., at the northern end of the valley, to the Gulf of Mexico. The Chief of Engineers recommended that all others, such as storage basins, controlled spillways, etc., be discarded, and that a definite plan, based upon the use of the three main basins, referred to as the northern or St. Francis Basin on the west, the middle, including the Yazoo Basin on the

east and the Tensas Basin on the west, and the southern or Louisiana section, known as the Atchafalaya Basin, be adopted. In transmitting this report, the Chief of Engineers said:

(2) "The plan is a comprehensive one, providing for the maximum flood predicted as possible, and for future expansion to meet changing conditions. It includes a spillway above New Orleans, diversion floodways in the Atchafalaya and Tensas Basins, a river bank floodway from Cairo, Ill., to New Madrid, Mo., together with strengthening and a moderate raising of existing levees. It is designed to prevent any material increase in flood stages. Channel stabilization and navigation improvement are included. Exclusive of rights of way, incidental drainage works, and damages, if any, recommended to be borne by local authorities, the estimated cost of flood control works is $185,400,000, and of channel stabilization and mapping $111,000,000; a total of $296,400,000. The distribution of cost must be determined by law. The suggestion is made that a distribution by which the cost of flood control works in general is borne 80 per cent. by the federal government and 20 per cent. by the Valley states, and the entire cost of channel stabilization is borne by the United States, would accord with the fiscal policy of the President and precedents establish by Congress. The reorganization of the Mississippi River Commission, federal control over structures within natural floodways, and the comprehensive mapping of the alluvial valley are also recommended. Flood control of tributaries will be reported upon after the completion of surveys already authorized by Congress."

(3) "The control of Mississippi floods by reservoirs is shown to be too costly to warrant their construction. Their development for local benefits is discussed. Other suggested schemes, including levees of sufficient height to contain the maximum possible flood, are discussed, but found inadvisable. The recommended plan fundamentally differs from the present project, in that it limits the amount of flood water carried in the main river to its safe capacity and sends the surplus water through lateral floodways. Its essential features and their functions are:

"Floodways from Cairo to New Madrid, from the Arkansas river through the Tensas Basin in the Red river, and from the Red through the Atchafalaya Basin to the Gulf of Mexico. These will relieve the main channel of the water it cannot carry, and lower the floods to stages at which the levees can carry them.

"A controlled spillway to hold the levels down to safe stages at and near New Orleans.

"Local setting back of the levees in the main river at bottle necks to increase its carrying and reduce its flood heights.

"Greater protection against crevasses, by strengthening the levee, by reducing flood heights, through the increased widths of channel afforded by floodways, spillways, and setbacks, and by moderately raising the levees where needed to meet predicted flood stages.

"The progressive revetment of caving banks, to protect the foundation of the levees and to stabilize the river, both for flood control and navigation.

"Improved navigation channels for river traffic, not less than 300 feet wide and 9 feet deep, to be obtained by dredging and training works where necessary between Cairo and New Orleans."

(4) "The estimated construction cost of the complete plan is $296,400,000, and it can be advantageously executed in approximately 10 years."

(5) "The project recommended gives the maximum of results for the minimum of cost. It recognizes the interests and protects the rights of those who will be chiefly benefited and of the taxpayers who furnish the funds. Complete flood control, embodying the cheapest practicable reservoir system, would be much more expensive."

(6) "The plan heretofore pursued has been the construction of levees high enough and strong enough to confine all of the flood waters within the river channels. The levees that have been constructed are not sufficiently high for such floods as are now predicted. The cost of raising and strengthening them sufficiently to carry extreme floods would greatly exceed the cost of the plan proposed. Furthermore, the extent of the disaster which follows a crevasse increases greatly as the flood is forced to higher stages by confinement wholly within the levee system. The loss of life and property in the recent great flood in the alluvial valley followed the breaking of the levees which reclaimed the land for the use of man. This reclamation had been pushed so far that insufficient room was left in the river for the passage of the unprecedented volume of flood water. The levees must be strengthened but a halt must be called on further material increase in their

heights and the consequent threat to the inhabitants of the areas they are built to protect."

(7) "Man must not try to restrict the Mississippi river too much in extreme floods. The river will break any plan which does this. It must have the room it needs, and to accord with its nature must have the extra room laterally. In its original state the river had only one low water channel until it reached the flat land near the Gulf, but in flood it overflowed an area 50 miles wide, which is really its natural flood bed. The water which cannot be carried in the main channel with the levee at reasonable height must be diverted and carried laterally. Some additional capacity can be obtained in the main river by local setbacks of the levees. As a general setback is not practicable the remainder must be supplied by floodways paralleling the general course of the river."

(8) "The plan recommended provides the requisite space for the passage of floods, and levees of adequate strength to withstand them, so that should a flood recur of the magnitude of the flood just experienced, the maximum of record, it would be passed out to the Gulf without danger to life in the alluvial valley, and without damage to property except in the floodways allotted for its passage. Controlling side levees limit the area of the floodways, and protect land not in the floodways where such protection justified its cost."

(9) "Should Divine Providence ever send a flood of the maximum predicted by meteorological and flood experts as a remote possibility, but not beyond the bounds of ultimate possibility, the floodways provided in the plan are still normally adequate for its passage without having its predicted heights exceed those of the strengthened levees. It is designed to be both simple and comprehensive, flexible and adequate to prevent a calamity such as that of 1927 from happening again as a result of any flood past or predicted. It is capable of modification or expansion, if desirable, to further accommodate an increasing population and its property."

This plan or project was adopted by Congress in the Flood Control Act, subject to revision by a commission to be appointed by the President, which was authorized to consider the "engineering difference between the adopted project and the plan recommended by the Mississippi River Commission in its special report, adopted November 28, 1927, * * * and to recommend to the President such action as it may deem necessary to be taken in respect to such engineering differences, and the decision of the President upon all recommendations or questions submitted to him by such board, shall be followed in carrying out the project herein adopted. The board shall not have any power or authority in respect to such project except as hereinbefore provided. Such project and the changes therein, if any, shall be executed in accordance with the provisions of section 8 of this act. [33 USCA § 702h.] Such surveys shall be made between Baton Rouge, La., and Cape Girardeau, Mo., as the board may deem necessary to enable it to ascertain and determine the best method of securing flood relief in addition to levees, before any flood control works other than levees and revetments are undertaken on that portion of the river: Provided, that all diversion works and outlets constructed under the provisions of this act shall be built in a manner and of a character which will fully and amply protect the adjacent lands: Provided further, that pending completion of any floodway, spillway, or diversion channel, the areas within the same shall be given the same degree of protection as is afforded by levees on the west side of the river contiguous to the levee at the head of said floodway, but nothing herein shall prevent, postpone, delay, or in any wise interfere with the execution of that part of the project on the east side of the river, including raising, strengthening, and enlarging the levees on the east side of the river."

$325,000,000 were authorized to be appropriated, instead of $296,400,000, recommended by the Chief of Engineers.

In section 2 of the act (33 USCA § 702b), Congress, instead of adopting the suggestion of having the states contribute 20 per cent. of the cost of the work, estimated that they had already spent $292,-000,000 for like purposes, and declared this to be a "full compliance" with the principle of local contribution, and that "no local contribution to the project herein adopted is required."

In section 3 (33 USCA § 702c) it was further provided that no money should be spent under the act "until the states or levee districts have given assurances satisfactory to the Secretary of War that they will (a) maintain all flood control works after their completion, except controlling and regulating spillway structures, including special relief levees; maintenance includes normally such matters as cutting grass, removal

of weeds, local drainage, and minor repairs of main river levees; (*b*) *agree to accept land turned over to them under the provisions of section 4;* (*c*) provide, without cost to the United States, all rights of way for levee foundations and levees on the main stem of the Mississippi river between Cape Girardeau, Mo., and the head of the Passes." (Italics by the author of this opinion.) This section further provides:

"No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: Provided, however, that if in carrying out the purposes of this Act it shall be found that upon any stretch of the banks of the Mississippi river it is impracticable to construct levees, either because such contruction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands."

I quote in full section 4 (33 USCA § 702d):

*"The United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi river; Provided, that in all cases where the execution of the flood control plan herein adopted results in benefits to property such benefits shall be taken into consideration by way of reducing the amount of compensation to be paid.*

"The Secretary of War may cause proceedings to be instituted for the acquirement by condemnation of any lands, easements, or rights of way which, in the opinion of the Secretary of War and the Chief of Engineers, are needed in carrying out this project, the said proceedings to be instituted in the United States District Court for the district in which the land, easement, or right of way is located. In all such proceedings the court, for the purpose of ascertaining the value of the property and assessing the compensation to be paid, shall appoint three commissioners, whose award, when confirmed by the court, shall be final. When the owner of any land, easement, or right of way shall fix a price for the same which, in the opinion of the Secretary of War is reasonable, he may purchase the same at such price; and the Secretary of War is also authorized to accept donations of lands, easements, and rights of way required for this project. The provisions of sections 5 and 6 of the River and Harbor Act of July 18, 1918, are hereby made applicable to the acquisition of lands, easements, or rights of way needed for works of flood control; Provided, That any land acquired under the provisions of this section shall be turned over without cost to the ownership of States or local interests." (Italics by the author of this opinion.)

I also quote that portion of section 8 (33 USCA § 702h) which is deemed pertinent:

"The project herein authorized shall be prosecuted by the Mississippi River Commission under the direction of the Secretary of War and supervision of the Chief of Engineers and subject to the provisions of this act. It shall perform such functions and through such agencies as they shall designate after consultation and discussion with the president of the commission. For all other purposes the existing laws governing the constitution and activities of the commission shall remain unchanged. The commission shall make inspection trips of such frequency and duration as will enable it to acquire first-hand information as to conditions and problems germane to the matter of flood control within the area of its jurisdiction; and on such trips of inspection ample opportunity for hearings and suggestions shall be afforded persons affected by or interested in such problems."

It will be observed that the policy of Congress in the late 70's and early 80's, when the Mississippi River Commission was created and began to function, and during which many of the cases cited and relied upon by the government arose, was entirely different from that disclosed by the act of 1928. As above stated, at that time the purpose was to aid commerce, benefit the postal service, etc., by improving navigation under the grant of power found in section 8 of article 1 of the federal Constitution, with a distinct declaration that money should not be expended for reclamation or preventing floods; whereas, in its latest action, the very bill itself is entitled: "An act for control of floods on the Mississippi river and its tributaries and for other purposes." Congress could no longer withstand the demand for protection to the enormous property values and population of the valley, or decline to assist in retaining the

lands which had been "reclaimed" from the original "natural bed" of the river, which the Chief of Engineers says, in its primal state, had a width of some 50 miles. It is scarcely to be expected that any one will ever question the constitutionality of this expansion of purpose—certainly not those states and persons who are to benefit by protection from the destructive forces of the great river.

■ I do not deem it necessary to discuss at length cases construing the police powers, as distinguished from those of eminent domain, for Congress appears, by the provisions of this statute, to have recognized that in benefiting and protecting some of the citizens, it had to do so at the expense of others, for the simple reason that all could not be included. Strictly speaking, the federal government has no police power, although in carrying out some of its delegated authority, such as the control of navigation, it exercises powers analogous to the police powers of the state. 12 C. J. 910, verbo "Constitutional Law," § 417. It is true that the second paragraph of section 3 (33 USCA § 702c) declares that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place, * * *" but it adds a proviso, directing the payment for such injuries to property as the government could not have been held liable for under decisions like those of Gibson v. U. S., 166 U. S. 269, 17 S. Ct. 578, 41 L. Ed. 996, and Bedford v. U. S., 192 U. S. 217, 24 S. Ct. 238, 48 L. Ed. 414. And immediately follows section 4 (33 USCA § 702d), above quoted.

This latter section seems to contemplate that the rights thus to be "furnished" shall be paid for, as in the very next paragraph the machinery and procedure for acquiring by condemnation, such as "in the opinion of the Secretary of War and the Chief of Engineers, are needed in carrying out this project, * * *" is established.

The statute does not make clear what is meant by "flowage rights for *additional* destructive floodwaters that will pass by reason of diversions from the main channel of the Mississippi river." However, heretofore it has been the object of the government, as well as of the states and subsidiary agencies, at all times, to keep the waters of the river in its main channel. It was only on occasions when this could not be done that they broke through and flooded property situated like that of the plaintiff. The Chief of Engineers and the War Department seem to construe the provisions of section 4 as apply-

ing only to conditions like those in the New Madrid area, where existing levees are to be lowered and used as a first "defense," while the higher or protecting embankments are placed further back. They contend, as I understand it, that in the Tensas or Bœuf River Basin, as well as the Atchafalaya, because existing levees will not be altered, and these areas will not be flooded until the waters of the main river reach a height where it would happen anyway under conditions existing when the act was passed, *no protection is being taken away from* property there; hence no *additional* water will be diverted. This, however, leaves out two considerations which Congress may have had in mind: First, that these areas were being deprived of such measure of safety as had been enjoyed by the possibility that the levees might break in some other locality, either as a result of their greater vigilance or a fortuitous event, thereby permitting them to escape; and, secondly, when the fuse plugs do go out, they will doubtless be washed out to the level of the surrounding land or deeper, and this property will be required to bear the burden, not only of its own share of the overflow waters, but, in addition, all of that which would otherwise cover the protected areas.

■ Is the construction of the Chief of Engineers the reasonable common-sense meaning of the language of the act, or is it more reasonable to assume that Congress viewed the adopted project as a departure from the previous method, of trying to keep all of the water in the main channel, and as in effect the dedication of these floodways to the duty of performing the service which the constantly rising levees had done in the past.

Congress, in a general way, at least as to engineering features, purported to adopt the project of the Chief of Engineers, but, as above pointed out, disregarded some of his recommendations as to the bearing of the expense, etc. However, the comparatively slight increase in the appropriation, from $296,400,000 to $325,000,000, would appear to be inadequate to cover the cost, if persons situated like the plaintiff are to be paid, and they have or may suffer injury to their property proportionate to what he claims. One cannot help but be impressed that the act as finally passed was an unskilled compromise, first, between those claiming that the state should bear a portion of the burden as against others insisting that the government pay the whole cost; and, secondly, those demanding that all injury suffered by property owners in the floodways should be compen-

sated, while others contended that the government should not be made responsible for anything except property actually taken and to be occupied by the levees and other work contemplated by the project.

It is a matter of common knowledge that action by Congress was delayed for some time as a result of disagreement and discussion with the President upon some of the points. However, it cannot be denied that, in so far as there will be a diversion of the waters of the main channel of the river and a directing of their course to the sea through these limited floodways or channels, property owners situated therein are called upon to suffer whatever losses may be entailed for the good of those whose protection is contemplated under the plan; and while the government may, for the purposes of commerce and navigation, construct levees and other works or improvement upon the banks and in the channel of streams, without liability to those who may suffer consequential damage, yet if the work in contemplation in this instance is not for such ends, but mainly for the benefit of other private property, then does there not arise in bar of that course the inhibition of the Constitution that private property shall not be taken for public purposes without just compensation?

The allegation that the War Department has not paid and does not intend to pay for the injuries claimed by plaintiff is, of course, admitted by the motion to dismiss. If the plaintiff's property and that of others similarly situated will be compelled to bear the burden of *additional* floodwaters, and the defendants are proceeding in disregard of such rights and the method for acquiring them laid down by the act, then clearly they are ignoring the statute, and under well-settled principles can be stopped by a court of equity until they comply with the law. 20 Corpus Juris, pp. 838, 839, verbo "Eminent Domain," and authorities cited in the footnote.

"An owner may obtain an injunction to restrain the taking or injury of his property, although such taking or injury is for a public purpose by one possessing the power of eminent domain, where such taking or injury is sought to be accomplished without the institution of condemnation proceedings." Id. 1173, § 533e, and authorities in footnote.

If the rights sought to be used are within the protection of the statute, the latter lays down the means for obtaining them, and fixes the time when the government shall be authorized to go into possession; that is, after filing a suit for condemnation and providing funds or securities to pay the owner, as directed by the court. The statutory method excludes all others, except, of course, amicable settlement with the owners. However, this does not prevent entry for the purposes of examination and survey. 20 C. J. p. 839.

The report of the Chief of Engineers states, speaking of the Mississippi, that "its alluvial valley has a growing population and contains the largest area of the richest land in the United States." Paragraph 46. He also calculates that, "in the absence of protecting works," 30,000 square miles of the valley would be flooded in high water, but, with the construction of the proposed system of levees and floodways, approximately 20,550 square miles "will be protected annually. The remaining 9,450 square miles, of which approximately 3,340 square miles is cleared land, will be protected on an average of 2 years in 3 and 14 years in 15, depending upon its location. The remaining 6,110 square miles is swamp and timbered land, which is not injured by the flood." Paragraph 23. He also states that the estimated cost of $296,400,000 does not "include the costs of rights of way nor possible damage to structures which have invaded the floodbed of the river." Paragraph 24.

After calculating or estimating the period during which the land in the floodway will be overflowed, and pointing out the opportunities which will remain for cultivation, he says (speaking of the necessity for the use of lands situated like those of plaintiff): "Any other use made of these areas must be subject to the higher use for the general control of the river. No curtailment of their [the floodways] area should be permitted which will run contrary to the protection of life in the large cities and the uninterrupted cultivation of the great areas that will be permanently protected by the plan."

This, of course, demonstrates the certainty that at some time the property within the floodway will be overflowed by the surplus waters of the Mississippi river, and the owner's use and occupancy is subordinated to that purpose. When or how often no one save Providence can tell. It is true that, based upon past experience, the Chief of Engineers estimates that it will not occur oftener than above indicated, depending upon the location of the property, but necessarily these figures are at best estimates or prophesies. Would any one under such circumstances feel justified in placing improvements thereon of a valuable or permanent character, when he knew that at some time, by express design

and inescapably, they would be destroyed by the great volume of water that is to be directed through these channels? Some of the property owners, like plaintiff, no doubt are small farmers, and it would be quite a hardship if they were compelled to acquire other property outside the floodway—in some cases 5 to 10 miles away—upon which to build their homes, farm buildings, etc., necessary to the cultivation of their lands within the floodway.

The "maximum possible" estimate of the Weather Bureau and the "maximum probable" estimate of the Mississippi River Commission of the volume of water that will pass down the valley at Arkansas City, as well as at the mouth of Red river, is fixed at approximately 3,000,000 second feet. It is proposed under such conditions to divert through the Tensas or Bœuf River Basin something less than 1,000,000 second feet, or about one-third, practically all of which will again return to be dealt with at the head of the Atchafalaya. From the latter point the plan contemplates that all in excess of 1,500,000 second feet, or approximately one-half of the total, will be then turned down the Atchafalaya basin. Thus appears the menace under which any one would labor who attempted to live in and cultivate the beds of these floodways. The Chief of Engineers is probably correct when he states that sufficient warning could be given to enable them to flee and save the lives of themselves and their live stock; but what would become of their crops and improvements, and in what condition would their property be left after the water had gone down?

In their supplemental brief, counsel for the government laid much stress upon decisions of the state court to the effect that the state, prior to the Constitution of 1921, was not required to pay for property taken for levee purposes. But, as pointed out in Eldridge v. Trezevant, 160 U. S. 452, 16 S. Ct. 345, 40 L. Ed. 490, this was because of the servitude imposed by the civil law upon the property of a riparian owner, compelling him to contribute, without compensation, space for levees and public highways. They can have no bearing on a situation like this, where the structures are in some places 50 miles inland, and intended to provide a floodway for waters diverted from the main channel in the state of Arkansas. Besides, it is alleged that these works are designed to hold the water upon plaintiff's property, and not for its protection.

It is also contended that the government may avail itself of all the powers of eminent domain of the state; but in Kohl v. United States, 91 U. S. 374, 23 L. Ed. 449, it was said: "If the United States has the power [of eminent domain], it must be complete in itself. It can neither be enlarged nor diminished by a state. Nor can any state prescribe the manner in which it must be exercised."

I have, of course, gone somewhat into the merits of the case, but only so far as seemed necessary in passing upon the exception of no cause of action, and to more clearly illustrate the view I entertain that its very nature takes it without the class which is controlled by the maxim "damnum absque injuria." In doing so I have attempted to confine my discussions to the allegations of the petition, the report of the Chief of Engineers as representing the expressed purpose of his department upon the questions involved, and such other well-known facts and conditions as any court might notice judicially.

My conclusion is that the petition does allege a cause and right of action, as well as grounds for the intervention of a court of equity, if they can be supported by proper proof upon the trial. For the reasons assigned, the motion to dismiss will be overruled.