## LANE, SECRETARY OF THE INTERIOR, *v.* WATTS.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT
OF COLUMBIA.

No. 889.   Argued April 14, 15, 1914.—Decided June 22, 1914.

A title which has passed by location of a grant and its approval by
proper officers of the Land Department cannot be subsequently di-
vested by the then officers of the department. *Ballinger* v. *Frost*, 216
U. S. 240.

The action of the Commissioner in approving the location of a non-
mineral float cannot be revoked by his successor in office, and an
attempt so to do can be enjoined. *Noble* v. *Union River Logging
Co.*, 147 U. S. 165.

A suit to restrain the Secretary of the Interior and the Land Commis-
sioner from doing under color of their office, an illegal act which will
cast a cloud upon the title of complainant is not one against the
United States; nor in this case is it one for recovery of land merely
or an attempted appeal from the decision of the Interior Depart-
ment or a trial of title to land not within the jurisdiction of the
court and wherein the United States is not present or suable.

A survey is necessary to segregate from the public domain lands at-
tempted to be located by a float grant. *Stoneroad* v. *Stoneroad*, 158
U. S. 240. In this case, *held*, that a survey was made and approved.

In this case, *held*, that the report of the Surveyor General and the sub-
sequent proceedings and survey by the Surveyor General of Arizona
amounted to a survey and finding that the lands were non-mineral
and that title thereto vested in the holder of the float grant selecting
the lands and passed out of the United States.

Where, as in this case, in order to accommodate conflicting claims and,
at the instance of the Government, claimants have given up rights
to a definite tract and accepted float grants for an equal amount of
land, it will be presumed that the Government would make provision
for the location of the substituted land as expeditiously as possible
and without expense to the holders of the float.

41 App. D. C. 139, affirmed.

THE facts, which involve the title to lands assigned on
one of the Baca Float Grants issued in substitution of the
Las Vegas Grant, are stated in the opinion.

See 235 U. S. 17, for further opinion in this case.

*Mr. Assistant Attorney General West* and *Mr. C. Edward Wright* for appellants.

*Mr. Herbert Noble, Mr. G. H. Brevillier* and *Mr. Joseph W. Bailey,* with whom *Mr. James W. Vroom* was on the brief, for appellees.

By leave of court *Mr. William C. Prentiss* filed a brief as *amicus curiæ.*

MR. JUSTICE McKENNA delivered the opinion of the court.

Appeal from the decree of the Court of Appeals of the District of Columbia affirming a decree of the Supreme Court of the District enjoining the Secretary of the Interior and the Commissioner of the General Land Office from proceeding in the matter of certain attempted entries under the public land laws of the United States upon lands which the decree finds were selected and located by the heirs of Luis Maria Cabeza de Baca on June 17, 1863, and known as Baca Float No. 3, the title to which, the decree further finds, passed out of the United States and vested in said heirs on April 9, 1864. The decree further directs the filing of the field notes and plats of survey of the Float for the purpose of defining the out-boundaries thereof and segregating the same from the public lands of the United States.

The origin and history of the Baca grant are set out in *Shaw* v. *Kellogg,* 170 U. S. 312, *Maese* v. *Herman,* 183 U. S. 572, and *Priest* v. *Las Vegas,* 232 U. S. 604.

It appears that there was a conflict between this grant and the grant to the town of Las Vegas, which was settled by an act passed on June 21, 1860 (12 Stat. 71, 72, c. 167), which enabled the heirs of Baca to select "an equal quantity of vacant land, not mineral, in the Territory of New Mexico, to be located by them in square bodies, not ex-

ceeding five in number." It was made the duty of the Surveyor General of New Mexico "to make survey and . location of the lands so selected by said heirs of Baca when thereunto required by them: Provided, however, that the right hereby granted to said heirs of Baca shall continue in force during three years from the passage of the ·act, and no longer."

The Las Vegas grant was ascertained to contain nearly 500,000 acres (496,446 96–100). The Baca heirs were, therefore, entitled to locate that many acres "in square bodies, not exceeding five in number." This controversy concerns the third of the bodies selected. The selection of each tract was to be determined by the same considerations, and those considerations are declared in *Shaw* v. *Kellogg, supra.* Each location, it is there said, would necessarily be of considerable size; in fact, each one was nearly 100,000 acres; and each as a whole was to be non- · mineral. "No provision was made for indemnity lands in case mineral should be found in any section or quarter section. So that when the location was perfected the title passed to all the lands or to none." (170 U. S., p. 332.) The limits of location, it was said, was the Territory of New Mexico, limits not so broad as those of the territory ceded by Mexico; within the limits there were large areas of arid lands; "its surface was broken by a few mountain chains, and crossed by a few streams." Lands, it was declared, could not be selected already occupied by others. The lands must be vacant. Nor could lands be selected "which were then known to contain mineral." "Congress did not intend to grant any mines or mineral lands, but with these exceptions their right of selection was coextensive with the limits of New Mexico. We say 'lands then known to contain mineral,' for it cannot be that Congress intended that the grant should be rendered nugatory by any future discoveries of mineral. The selection was to be made within three years. The title was then to pass; and

it would be an insult to the good faith of Congress to suppose that it did not intend that the title when it passed should pass absolutely, and not contingently upon subsequent discoveries." And it was declared that the surveyor general of New Mexico was to determine the character of the lands; he was to make survey and location of the lands selected; upon him "was cast the specific duty of seeing that the lands selected were such as the Baca heirs were entitled to select." This is emphasized by saying that "he was the officer who, by virtue of his duties, was most competent to examine and pass upon the question of the character of the lands selected" (p. 333). In the survey and location it was recognized that he was subject to the "control and direction of the Land Department," and, while he was not to act in defiance and independently of the Land Department, "it was for him to say, in the first instance at least, whether the lands so selected and by him surveyed and located, were lands vacant and non-mineral" (p. 334).

These are the elements of the decision. How do they apply to the case at bar?

First, as to the allegations of the bill. There are detailed allegations of the origin of the grant to Baca, its presentation to the surveyor general of New Mexico under the then existing law and regulations and his recommendation of its confirmation, also of the confirmation of the grant to the town of Las Vegas, "leaving," as he said, "the respective claimants the right to adjust their conflicting claims in courts." The other facts which the bill alleges we set out in narrative form as follows:

Both grants were confirmed and the right given to the heirs of Baca, as we have seen, to select other lands equal in quantity to the lands claimed by Las Vegas.

On July 26, 1860, about a month after the act was passed, the Commissioner of the General Land Office informed the surveyor general of New Mexico that it was

the latter's duty to separate from the public lands the pueblos or individual confirmed claims, and in that connection drew his special attention to the act of June 21, 1860, which referred to the "claim of the Heirs of Luis Maria Baca," and in order to give the act timely effect the surveyor general was directed to give the claim priority in surveying private land claims. That officer was directed to have the exterior lines of Las Vegas run off, and, this being done, the right would accrue to the Baca claimants to select a quantity equal to the area elsewhere in New Mexico of vacant lands, not mineral, in square bodies, not exceeding five in number. The instructions then proceed as follows:

"You will furnish them with a certificate transmitting at the same time a duplicate to this office, of their right and the area they are to select in five square parcels. Should they select in square bodies according to the existing line of the surveys, the matter may be properly disposed of by their application duly endorsed and signed with your certificate designating the parts selected by legal divisions or subdivisions, and so selected as to form five separate bodies in square form. Then the certificate thus endorsed is to be noted on the records of the Register and Receiver of Santa Fe and sent on here by those officers for approval. Should the Baca claimants select outside of the existing surveys, they must give such distinct descriptions and connection with natural objects in their applications to be filed in your office, as will enable the Deputy Surveyor when he may reach the vicinity of such selections in the regular progress of the surveys, to have the selections adjusted as near as may be to the lines of the public surveys, which may hereafter be established in the region of those selections. In either case the final conditions of the certificate to this office must be accompanied by a statement from yourself and register and receiver that the land is vacant and not mineral."

The grant to the town of Las Vegas was surveyed and
the fact communicated by the surveyor general to the
representative of the heirs of Baca and they were informed
that they were entitled to select an equal quantity of land,
that he was authorized to survey and locate the same and
that his office was ready to coöperate with their legal repre-
sentative "and receive his application for the location of
the lands granted by the Government."

Thereupon, on or about June 17, 1863, in pursuance of
the notice from the surveyor general and the act of Con-
gress, the following was addressed to the surveyor gen-
eral:

"I, John S. Watts, the attorney of the heirs of Don Luis
Maria Cabeza de Baca, have this day selected as one of
the five locations confirmed to said heirs under the 6th
section of the act of Congress approved June 21st, 1860,
the following tract, to-wit.—Commencing at a point one
mile and a half from the base of the Solero Mountain in
a direction north forty-five degrees east of the highest point
of said mountain, running thence from said beginning
point west twelve miles thirty-six chains and forty-four
links, thence south twelve miles thirty-six chains and
forty-four links, thence east twelve miles thirty-six chains
and forty-four links, thence north twelve miles thirty-six
chains and forty-four links, to the place of beginning, the
same being situate in that portion of New Mexico now
included by act of Congress approved February 24, 1863,
in the Territory of Arizona,—said tract of land is entirely
vacant, unclaimed by anyone, and is not mineral to my
knowledge.

"JOHN S. WATTS,
"Attorney for the Heirs of Luis Maria Cabeza de Baca."

On the same day the surveyor general certified to the
Commissioner of the General Land Office the fact of the
application, repeating it, and concluding as follows:

"And I further certify that the said tract of land being the one-fifth part of the private claim confirmed to the said heirs, contains ninety-nine thousand two hundred and eighty-nine acres and thirty-nine hundredths of an acre, and that this location is the third of the series (application to locate the same, filed in this office October 31, 1862—dated October 30, 1862—having been withdrawn— See Letter of Commissioner of the General Land Office dated February 5, 1863) and, with the three locations, numbered one, two and four heretofore made, included four-fifths of the said private claim confirmed to the heirs of Luis Maria Cabeza de Baca, by the act of Congress approved June 21, 1860.—Said location is hereby approved.

"In witness whereof I have hereto set my hand this 17th day of June, 1863.

"JOHN A. CLARK,
"Surveyor General."

The communication was mailed the following day, with a letter to the Commissioner as follows:

"SURVEYOR GENERAL'S OFFICE,
"Santa Fe, New Mexico, June 18, 1863.

"Honl. J. M. EDMUNDS, Comm'r of General Land Office, Washington City, D. C.

"Sir: I enclose herewith copy of the application and certificate of location No. 3 of the private claim confirmed to the heirs of Luis Maria Cabeza de Baca.

"As this location is far beyond any of the public surveys, I have not deemed it necessary to procure any certificate from the Register and Receiver of the Land Office, as from the nature of the case, they cannot officially know anything concerning it.

"I am respectfully your
"Obt. servt.
"JOHN A. CLARK,
"Surveyor General."

On July 18 the Commissioner acknowledged the receipt of the communication, stating: "Your approval of the location under consideration is found to have ignored the imperative condition that the lands selected at the base of Solero Mountain now included by act of Congress approved February 24, 1863, in the Territory of Arizona, is vacant land and not mineral. Before the application of Location No. 3 of the heirs aforesaid can be approved, by this office, it is necessary that our instructions of the 26th of July 1860, should be complied with by furnishing a statement from yourself and Register and Receiver that the land thus selected and embracing one-fifth of the claim or 99,289 39-100 acres is vacant and not mineral.

"I am very respectfully,
"Your obt. sevt.
J. M. EDMUNDS, Commissioner."

In a letter dated April 2, 1864, the surveyor general, in reply to that of the Commissioner, stated, "that there is no evidence in the office of the surveyor general of New Mexico" that the tract selected "contains any mineral or that it is occupied. There have been no public surveys made in the neighborhood of said tract; and there is no record of, or concerning, the land in question in the surveyor general's office, nor—as I believe—in the office of the Register or Receiver of the Land Office of New Mexico. As I am personally unacquainted with that region of country, I cannot certify that the land in question is 'vacant and not mineral' or otherwise. Those facts can only be determined by actual examination and survey."

On March 25, 1864, the Receiver of the Land Office in New Mexico made a certificate stating that the lands applied for "are vacant and not mineral so far as the records of this office show (not having been surveyed)." The Register in his certificate of the same date stated that

the lands "are not surveyed, and, from all information in this office, are vacant and not mineral."

On about April 9, 1864, having been required by the Baca heirs to survey the tract located by them, the Commissioner of the General Land Office issued instructions to the surveyor general of Arizona which recited that the location by the Baca heirs had been approved by the surveyor general of New Mexico in whose jurisdiction, it was said, the application properly came at the date of the approval. The instructions referred to the act of Congress of 1860 and the rights it conferred and stated that the act of June 2, 1862, required all grants to be surveyed at the expense of the claimants and that whenever the Baca claimants should pay or secure to be paid a sum sufficient to liquidate all the expenses a survey was to be directed of the application and transcripts of the field notes and plats to be transmitted to the General Land Office to constitute "the muniments of title, the law not requiring the issue of patents of these claims." Directions as to the manner of marking lands were given. Accompanying the instructions was a copy of the certificate of the surveyor general of New Mexico dated June 17, 1863, and following that the following order:

"GENERAL LAND OFFICE,
"April 9, 1864.
"LEVI BASHFORD, ESQ., Surveyor-General, Tucson, Arizona.

"Sir: The foregoing statement and the certificate of Surveyor General Clark having been submitted to this Department and having undergone a careful examination, the location being approved by him to perfect title under the authority of the act approved June 21, 1860, application for survey having been made. Instructions (copy herewith attached) have been given to Surveyor General Levi Bashford of Arizona in which Territory the lands

located now are, to run the lines indicated and forward complete survey and plat to be placed on file for future reference as required by law.

"J. M. EDMUNDS, Commr."

In pursuance of this order a survey was undertaken, but the surveyors, while engaged in the work of the survey, were killed by hostile Indians, and no survey was ever returned (alleged on information and belief). Notwithstanding the repeated requests of the heirs of Baca, the Commissioner of the General Land Office failed and refused to continue or have made the survey ordered as above stated and persisted in such refusal until on or about June 17, 1905, on which date the Commissioner, by an official order, authorized and directed the surveyor general of Arizona to cause a survey to be made, and in pursuance of and under contract No. 136 dated June 17, 1905, one Philip Contzen was authorized and required to run the lines indicated on the application of the Baca heirs (Float No. 3) so as to adjust the lines, as near as might be, to the lines of the public surveys.

The survey was made and duly certified by the surveyor general of Arizona as strictly conformable to the field notes which had been examined, approved and filed in his office, and that the plat and survey had been examined and found correct by the Commissioner of the General Land Office.

On or about January 12, 1905, the Commissioner of the General Land Office, disregarding the decision and order of the then Commissioner of the Land Office of April 9, 1864, gave such instructions to the surveyor general of Arizona regarding his duties as to the character of the lands that that officer in December, 1906, forwarded the plat and survey hereinbefore mentioned to the Commissioner of the General Land Office with a report accompanied by the alleged information which he had gathered

and the recommendation that the location of Baca Float No. 3, made as hereinbefore stated June 17, 1863, be entirely rejected.

On or about May 13, 1907, contrary to law and without jurisdiction so to do, and disregarding the order of his predecessor, the Commissioner rendered a decision ordering a hearing before the surveyor general of Arizona to determine whether said lands were, at the time of said location, vacant and non-mineral. On or about June 2, 1908, the First Assistant Secretary of the Interior, in a decision upon an appeal from said decision of the Commissioner, contrary to law and without jurisdiction, affirmed the decision of the Commissioner in so far as it remanded the case for a hearing before the surveyor general of Arizona.

A motion to review was subsequently made and denied.

By the acts done in the selection and location of the lands, including the order of Commissioner Edmunds of April 9, 1864, requiring a survey thereof, the title to the lands vested in fee in the heirs of Baca, and it was not within the power of the Land Department to revoke or annul the prior rulings or to evade the rights of such heirs or their successors in title and that (this on information and belief) the Land Department has always treated the lands selected as segregated from the public domain and they have for many years been so marked upon the maps issued by the Department, as more specially appears from the map of the Territory of Arizona of 1903.

It is alleged that one Henry Ohm and one Lyman W. Wakefield have filed homestead applications upon land lying within the lands located by the Baca heirs and instructions have been issued from the officers of the Land Department permitting proofs to be made thereof. It is alleged that there are many other entries upon the lands and that they and Ohm's and Wakefield's applications will cast clouds upon the title of the Baca location.

The value of the lands located is alleged to be over $100,000 and that plaintiffs have no adequate remedy at law.

An injunction was prayed restraining defendants from further proceeding in the homestead applications, that they be required to place on file for future reference, as required by law, the Contzen survey and plat dated June 17, 1905; that anything shown thereby or connected therewith, other than that included in the order of the Commissioner of April 9, 1864, and other than the exterior boundaries, accessory lines, crosses and distances, monuments and measurements showing the tract located by the Baca heirs known as Location No. 3, together with any topographical features and the references to the lines of the public surveys, be canceled and expunged from the said plat of said survey, and particularly the lines, crosses and distances, monuments and measurements purporting to show the segregation from said land of the alleged mineral portion, the Tubac Township, and the conflicting portions of the San Jose, Sonoita, Tumacacori and Calabasas claims.

A demurrer was filed to the bill which set out as grounds: (1) The real purpose of the suit is to recover certain real estate situated in the Territory of Arizona by trial of the legal title thereto and that the relief, if any, plaintiffs are entitled to is at law. (2) If the legal title to the property passed to plaintiffs, as alleged, on April 9, 1864, "naught else remains for the defendants to do other than to perform the ministerial duty of receiving and recording the plat of survey and field notes thereof," and the remedy is by mandamus. (3) If the legal title to the land has not passed to plaintiffs as alleged, it is still in the United States, which it is not shown has consented to this suit; and the court in such event is without jurisdiction. (4) On the face of the bill it is impossible to grant the prayers of plaintiffs without deciding whether the title is still in

the United States. The determination of the suit there-. fore affects the United States and they are real and indispensable parties in interest and have not consented to be sued. (5) The acts sought to be enjoined are exclusively within the jurisdiction of the Interior Department and are not subject to judicial control. (6) The parties who have initiated claims are materially interested in the suit and are necessary parties to it. (7) The court is without jurisdiction to expunge the matters and things prayed to be expunged from the plat of the survey of the San Jose de Sonoita claim for the reason that the claimants are not parties to the suit and their claim has been confirmed by the Supreme Court of the United States (*Ely's Administrator* v. *United States,* 171 U. S. 220). (8) The citizens of Tubac Township are necessary parties. (9) There never has been an adjudication by the Secretary of the Interior and the Commissioner of the General Land Office, or either of them, that the lands involved were on June 17, 1863, non-mineral and vacant or unoccupied lands such as the heirs of Baca were authorized to select under the terms of the sixth section of the act of June 21, 1860 (12 Stat. 71, c. 167). (10) The plaintiffs are not entitled to the relief prayed for, or to any relief. (11) The bill is in other respects uncertain, informal and insufficient to entitle plaintiffs to any relief.

The demurrer was overruled, Mr. Justice Barnard of the Supreme Court saying that the main question to be decided on the demurrer was as to the effect of the act of Congress, and, considering the act and the proceedings taken under it recited in the bill, he said he was of opinion that the title to the "tract vested in the heirs of said Baca when the location was approved, and the survey ordered" and that, therefore, plaintiffs might maintain their bill for some portion, at least of the substantial relief for which they prayed, and that the demurrer, being to the whole bill, must be overruled. And he said: "This con-

clusion as to title, if correct, will enable the suit to be main-
tained, notwithstanding the objection made as to want
of other parties defendant. Title being out of the United
States, it has no interest and is not a necessary party; and
the Land Department cannot rightfully treat the tract
as open to public entry, and the officers may therefore be
enjoined."

The defendants (appellants) then answered.

The answer admitted what must be regarded as the
fundamental elements of the bill. So far as its denials of
any of the averments of the bill or its allegations of fact
are material we shall refer to them hereafter. The proofs
taken under the bill and answer were not regarded by the
Supreme Court as determining a different decision from
that expressed on the demurrer to the bill, that is, the
court repeated its view that the title passed on April 9,
1864, to the heirs of Baca and that the court had au-
thority to enjoin defendants from treating the land as
being public land. The injunction prayed for was granted
except that the "Contzen" survey and plat were ordered
to be filed unchanged. A decree was entered accordingly.
It was affirmed by the Court of Appeals, as we have said.

The crux of the case in the views of the courts below is
the question whether title to the lands passed out of the
United States in April, 1864, and the careful and elaborate
consideration of it makes the discussion of it mere repeti-
tion.

The contentions of the parties are very accurately op-
posed. Appellants contend that "under a proper con-
struction of the act of June 21, 1860, title to the 'float'
cannot pass until there has been an official survey and a
final determination by the proper officers that the land
selected in 1863 was of the character which the statute
permitted the heirs to take—a matter still *sub judice* in
the Department" except as to certain conflicting grants.
The appellees insist, and the courts below, as we have

seen, decided, that the location of the grant and the approval of it by the surveyor general of New Mexico and subsequently in April, 1864, by Commissioner Edmunds of the Land Office transferred the title to the heirs of Baca.

There is some controversy upon the fact as to whether the Commissioner had before him the proof he had demanded of the non-mineral character of the land. We think the lower courts rightly deduced from the evidence "that the Commissioner," to quote from the opinion of the Court of Appeals, "having carefully considered all the facts in the case, concluded to adopt the approval of the surveyor general of New Mexico of this location to perfect title under the authority of said act [act of 1860], and, in order completely to segregate this land from the public domain, ordered the survey" (41 App. D. C. p. 153). And that this action was within the authority of those officers we may refer to *Shaw* v. *Kellogg, supra.* In that case, we have seen, the surveyor general of New Mexico was the officer selected and who was most competent to examine and pass upon the question of the character of the lands, and to pass upon them at the time of location—not upon evidence collected many years after the location, directed to what might have been known many years before. The selection and location was to be made within three years of the passage of the act in a comparative wilderness and the "title was then to pass," and "pass absolutely, and not contingently upon subsequent discoveries."

We recognized in *Shaw* v. *Kellogg* that the action of the surveyor general was subject to the supervision of the Land Department and that condition is satisfied in the case at bar. The Commissioner was put in possession of all of the facts as to the lands, and, exercising his judgment upon them, approved the location.

The facts in *Shaw* v. *Kellogg* give pertinence to its prin-

ciples, notwithstanding some differences between its facts and those in the case at bar. In that case there was a positive declaration by the surveyor general of the non-mineral character of the lands; in the case at bar it is an inference deduced from the circumstances, it being the "duty of the officers to decide the question"—a duty which they "could not avoid or evade." In that case the Land Office undertook to reserve from the grant, lands which might be subsequently discovered to be mineral. In this case it directed an inquiry of their character long after the location of the grant and seeks to determine the legality of the location by the information said to be obtained.

The title having passed by the location of the grant and the approval of it, the title could not be subsequently divested by the officers of the Land Department. *Ballinger* v. *United States ex rel. Frost,* 216 U. S. 240. In other words, and specifically, the action of the Commissioner in approving the location of the grant cannot be revoked by his successor in office, and an attempt to do so can be enjoined. *Noble* v. *Union River Logging R. Co.,* 147 U. S. 165; *Philadelphia Company* v. *Stimson,* 223 U. S. 605. The suit is one to restrain the appellants from an illegal act under color of their office which will cast a cloud upon the title of appellees.

This disposes of the contentions of appellants that this is a suit against the United States, or one for recovery of land merely, or that there is a defect of parties, or that the suit is an attempted direct appeal from the decision of the Interior Department or a trial of a title to land not situated within the jurisdiction of the court "wherein an essential party is not present in the forum and is not even suable—the United States."

We agree with the courts below that a survey was necessary to segregate the lands from the public domain. *Stoneroad* v. *Stoneroad,* 158 U. S. 240. This was done by the

Contzen survey, which we have seen was directed to be filed by the lower courts without alteration, a decision which we approve.

There are other contentions of appellants which call for no extended comment, as we concur with the courts below in regard to them. For instance, it is contended that the surveyor general of New Mexico had lost authority to approve the location and that duty had devolved upon the surveyor general of Arizona. To the contention it may be replied, as the Court of Appeals in effect replied, that the act of 1860 devolved the duty on the surveyor general of New Mexico and the Land Office, upon whom devolved the ultimate responsibility, and who approved the location.

A point is made upon attempts to change the location, of which it is enough to say that they were not accepted by the Land Department and the claimants were remitted to the location under consideration.

Another contention is made on the conflict of the grant as located with other grants, to which the Court of Appeals replied that it was not now concerned with such question and that if, as suggested, a controversy should arise it "will properly be adjudicated in the courts where the lands are located." In this we concur.

Whose duty it was to pay the expense of the survey is also in controversy. The appellants assert it to have been the duty of the claimants under the act of June 2, 1862 (12 Stat. 410, c. 90), and that was the view, we have seen, of the Land Department. The appellees contend that the obligation was upon the Government under the granting act. That act provides, as we have seen, that "it shall be the duty of the surveyor general of New Mexico to make survey and location of the lands so selected by said heirs of Baca when thereunto required by them. . . ." The obligation is explicit, and there was reason for it. To accommodate conflicting claims and at the instance of

the Government the Baca claimants gave up their rights to a definite tract of land, and, as appellees say, expressing the equities of the claimants, whatever its character or condition, and the Government therefore would naturally make provision for the location of the substituted land as expeditiously as possible and without expense to the Baca heirs. We therefore think the act of 1860, not that of 1862, applied.

The contention that appellees have not shown sufficient title is untenable.

*Decree affirmed.*