## BROADWATER–MISSOURI WATER USERS' ASS'N et al. v. MONTANA POWER CO.

### No. 10350.

Circuit Court of Appeals, Ninth Circuit.

Jan. 4, 1944.

R. V. Bottomly, Atty. Gen., C. J. Dousman, of Helena, Mont., E. Ben Johnson and Burcham & Blair, all of Spokane, Wash., Edmond G. Toomey, of Helena, Mont., and Willard W. Gatchell, Atty., Federal Power Commission, of Washington, D.C., for appellants State Water Conservation Board and others.

Wellington D. Rankin, of Helena, Mont., and Frank T. Hooks, of Townsend, Mont., for appellant, Broadwater Missouri Water Users' Ass'n.

W. H. Hoover, R. H. Glover, John V. Dwyer, and J. E. Corette, Jr., all of Butte, Mont., for appellee.

Before GARRECHT, DENMAN, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The Montana Power Company, incorporated in New Jersey, is engaged in the business of generating and distributing electric power in the state of Montana. It brought suit in the federal court for Montana against the State Water Conservation Board, the individual members thereof, and the Broadwater-Missouri Water Users' Association (an organization of the settlers in the Broadwater-Missouri irrigation project).

In its complaint the Power Company asserted the right by prior appropriation to the use of all the waters of the Missouri River and its tributaries for the purpose of operating certain hydro-electric plants —seven in number—located on the upper reaches of that stream. It alleged that on June 28, 1938, the defendant State Water Conservation Board had filed a notice of appropriation of 400 second feet of the waters of the Missouri for the purpose of irrigating lands in Broadwater County and for other beneficial purposes; that the Board had completed plans for the construction of a dam and irrigation works to divert the amount of its appropriation at a point above the dams and hydroelectric plants of the plaintiff, and had let or was proceeding to let contracts for, and to construct, a diversion dam across the river with the design of conducting water from the stream for the irrigation of seasonal

crops; all of which conduct was alleged to be in derogation of the rights of the plaintiff. There was a prayer that the plaintiff's title to the use of the water of the river be quieted as against the defendants and that they be permanently enjoined from constructing and maintaining the dam and diverting water, or from interfering in any manner with the flow of the stream and plaintiff's use thereof.

The State Water Conservation Board and its members interposed a motion to dismiss on the jurisdictional ground that the action was one against the state of Montana and not one between citizens of different states. The motion was denied, the defendants answered, and after extensive hearings before a special master a decree was entered confirming in the Power Company the right to the use and control of the waters of the Missouri up to a stated maximum flow necessary to operate the power plants of that Company, plus the flow requisite to keep its storage reservoirs filled. The decree permanently enjoined the defendants from diverting, storing, or using the waters of the river except at times when the prior demands of the plaintiff have been satisfied.

The appeal presents a number of important questions of local law affecting the merits of the adjudication. One of these relates to the claimed right of the state Board to bring down to its diversion dam and there divert water previously stored by it on a tributary of the Missouri, and to the Board's right, claimed under the provisions of the act creating it, to the return flow or seepage from previous use. Others relate to the propriety of the court's having allowed the reservoir storage rights of appellee to be supplied from the normal flow of the stream rather than limiting the same to flood and waste waters as said to be provided by statute, and to questions relating to the adjustment or accommodation of rights as between irrigation and power users, it being asserted by the appellants that the decree unnecessarily gives to the Power Company a monopoly of the river. We mention these matters preliminarily since they disclose some of the serious questions of state practice and policy here involved.

■ At the outset, however, we are confronted with the problem of jurisdiction. The complaint presents no federal question. If, as contended, the State Water Conservation Board is the alter ego of the state of Montana in acquiring the water rights and in the erection and operation of the diversion works inspiring the suit, then it is plain that jurisdiction is not present. A state is not a citizen and, absent a federal question, the district courts are not possessed of jurisdiction of suits by or against a state. Postal Telegraph Cable Co. v. State of Alabama, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231; Judicial Code § 24, as amended, 28 U.S.C.A. § 41(1).

The act creating the State Water Conservation Board was adopted in 1933 and has several times been amended or amplified. The legislation is found in Chapter 35 of the Political Code as embodied in the Revised Codes of Montana of 1935, §§ 349.1 to 349.38. The Governor and the state engineer are ex-officio members of the Board. The three remaining members, who are required to be qualified electors, are appointed by the Governor for terms of six years and are removable by him at any time. Like state officers generally, the appointive members are required to take, subscribe, and file with the Secretary of State the oath prescribed by the Constitution. The Governor is chairman of the Board, and the Attorney General is made its legal advisor. The compensation of the appointive members is payable from funds provided by legislative appropriation. § 349.3. No compensation, other than their regular salaries, is provided for the ex-officio members or for the Attorney General.

The object of the Act is stated in § 349.1 as follows: "It is hereby declared that the public interest, welfare, convenience and necessity require the construction of a system of works, in the manner hereinafter provided, for the conservation, development, storage, distribution and utilization of water. The construction of said system of works, is, and is hereby declared to be, a single object; and the construction, operation and maintenance of said system of works, as herein provided for, is hereby declared to be in all respects for the welfare and benefit of the people of the state, for the improvement of their prosperity and living conditions; and the state water conservation board hereinafter created shall be regarded as performing a governmental function in carrying out the provisions of this act."

The act is responsive to what was felt by the Legislature to be "a state-wide need" for a comprehensive program of water conservation. § 349.5. To the extent neces-

sary to carry out its provisions, "the board shall have full control of all the water of the state not under the exclusive control of the United States and not vested in private ownership, and it shall be its duty to take such steps as may be necessary to appropriate and conserve the same for the use of the people." § 349.15. In acquiring rights and in administering the act, the Board is not limited to the terms of the statutes relating to water rights theretofore enacted, "but, in addition thereto, may initiate a right to the waters of this state by executing a declaration in writing of the intention to store, divert or control the unappropriated waters of a particular body, stream or source, * * *." § 349.18.

Section 349.22 bestows upon the Board broad administrative powers in respect of the control and division of the natural flow of streams, and provides that when exercising the authority given it the Board "shall be deemed to be exercising a police power of the state of Montana." It is declared in § 349.23 that the Board "shall be a body corporate and politic with perpetual existence, and as such, it shall be deemed to be an agency of the state of Montana." By § 349.10 and § 349.13 direct legislative appropriations were made both for the administration fund and for a conservation revolving fund. In addition, all moneys paid or repaid the Board are, with certain exceptions, re-appropriated to the Board. Laws of Montana 1937, pp. 688–690.[1]

The Board is authorized to issue "water conservation revenue bonds of the state" for the purpose of paying the cost of public works and projects, but these bonds "shall not constitute or be a debt, liability or obligation of the state," and shall be secured only by revenues from operation and by funds from the sale of water or disposition of the works and facili-

ties acquired. § 349.6. Title to property purchased or condemned is to be taken in the name of the Board. § 349.4. The Board may sue and be sued, § 349.3, and the statute authorizes it to sue in the state or federal courts for the purpose of acquiring and holding title to property for dam sites, etc., and it may prosecute actions for the adjudication of water rights on any stream. § 349.15. The Board is further authorized to exercise its powers in any adjoining state or country, subject to the laws thereof or of the United States. § 349.5.

The act has been construed by the Montana court in State ex rel. Normile v. Cooney, 100 Mont. 391, 47 P.2d 637. The complainant in that proceeding sought to enjoin the Board from constructing an irrigation and flood control project under the terms of a loan-grant agreement with the United States, it being asserted that the enabling statute violates provisions of the State Constitution. In refuting the objection that the act delegates legislative powers, the court said that "the water conservation board does not make the law, but in the execution of it as a public agency and as the agency of the lawmaking department, it is for the board to ascertain and declare the event upon which the expressed will of the Legislature is to take effect." (100 Mont. at page 404, 47 P.2d at page 644.) Again at page 408 of 100 Mont., 47 P.2d at page 646, of opinion, the court said: "The purpose of the [legislative] appropriations above referred to is for a public use. The water conservation board is created by law. It is an agency of the state. It is under the control of the state * * *."[2]

The terms of the statute and the holding in the Cooney case leave little room for doubt that the Board is a mere arm of the sovereign.[3] Its members are state of-

---

[1] In 1939 the legislative appropriations to the Board for the ensuing biennium, amounting to $880,000, were made out of moneys in the general fund in the state treasury not otherwise appropriated. Laws of Montana 1939, pp. 675, 676.

[2] In the course of its decision the court said that the property acquired by the Board is owned by the state, and on the same page of the opinion observed that ownership thereof is in the Board. These utterances, seeming on superficial reading to be contradictory, are indicative, rather, of the court's thought that

the Board and the state are indistinguishable.

[3] Appellees call attention to Geboski v. Montana Armory Board, 110 Mont. 487, 103 P.2d 679, 682, in which case an armory board, created by the Legislature, was described as "a public corporation separate and apart from the state." The armory board was authorized by the statute to erect armories and to lease them to the state, or to donate them to the state after they were fully paid for. We see nothing of value to be gleaned from the decision.

ficers. The duties they perform might appropriately have been delegated solely to existing constitutional officers and performed directly in the name of the state. While appellee insists that the rights, property and funds held by the Board are not owned by the state, the actuality of state ownership would become immediately evident if the Legislature were to abolish its agency. Cf. Wilson v. State Water Supply Commission, 84 N.J.Eq. 150, 93 A. 732. In view of the scope of modern governmental activities it would be impertinent to inquire, as appellee would have us do, whether the federal courts may disregard the legislative declaration to the effect that the functions of the Board are governmental. Certainly the conservation and development of its public waters is an enterprise of fundamental concern to an arid state like Montana, where recurring droughts point the urgent need for such a program. A somewhat similar program for the development and utilization of water in the arid regions of the United States has long been regarded by Congress as an appropriate subject for governmental attention, as witness the creation and expansion of the activities of the United States Reclamation Service, 43 U.S.C.A. § 371 et seq.

Appellee likens the Board to an irrigation district and cites Montana cases holding that such boards are distinct entities, performing private and proprietary functions, Thaanum v. Bynum Irr. Dist., 72 Mont. 221, 232 P. 528; Buffalo Rapids Irr. Dist. v. Colleran, 85 Mont. 466, 279 P. 369. In the case last cited the court observed (85 Mont. at page 479, 279 P. at page 373) that such districts "are not created with a view to benefit the state * * * but in order to promote the material prosperity of the few owning property within their boundaries." We see no reason for assimilating such local quasi-public corporations with a state agency of the character of appellant.

The precedents support the view that the state is the real party in interest. In Kansas City Bridge Co. v. Alabama State Bridge Corp., 5 Cir., 59 F.2d 48, 50, a diversity case, it was held that the suit was in substance against the state although prosecuted against a legislatively created corporation authorized by statute to sue and be sued. The corporation had been set up for the purpose of erecting toll bridges which were, on recoupment of their cost, ultimately to be made free for the use of the public. It was thought that this function was one which the state might perform either in its own name or through its public officers or one of its governmental agencies, the court saying that "in the nature of things the state had to choose some such agency in order to effectuate its purpose."

The case of State Highway Commission of Wyoming v. Utah Const. Co., 278 U.S. 194, 49 S.Ct. 104, 106, 73 L.Ed. 262, involved a suit against a state agency on a road construction contract. Originally the Commission had been empowered to sue and be sued in its own name in any court upon any contract executed by it. This provision was amended after the institution of the particular action so as to limit suits against the Commission to those brought in the local tribunals. Said the court: "It is unnecessary for us to consider the effect of the general grant of power to sue or be sued to the highway commission or its withdrawal in 1927—this suit, in effect, is against the state and must be so treated. No consent by the state to submit itself to suit could affect the question of diverse citizenship." Since no ground of jurisdiction was asserted other than that of diversity of citizenship, it was held that the suit could not be maintained.

In Fowler v. California Toll-Bridge Authority, 9 Cir., 128 F.2d 549, we affirmed the decision of the lower court holding that it was without jurisdiction to entertain a suit brought by a citizen of Louisiana against the California Toll-Bridge Authority, a state agency authorized by statute to sue and be sued in its own name. The nature and functions of the Authority are sufficiently described in that opinion and we need not stop to analyze them again. Somewhat in the same way as here, bonds of the Authority were authorized to be issued, secured wholly by a lien upon the tolls and other revenue obtained from the operation of the particular toll bridge acquired or constructed. These bonds, like those issued by the Montana Board, were not obligations of the state. Consult further on the general subject State Highway Commission v. Kansas City Bridge Co., 8 Cir., 81 F.2d 689; Suncrest Lumber Co. v. North Carolina Park Comm., 4 Cir., 29 F.2d 823.[3a]

---

[3a] We think the decision in Port of Seattle v. Oregon & W. R. Co., 255 U.S. 56, 41 S.Ct. 237, 238, 65 L.Ed. 500, is not in point. The Port was a local body,

It is argued that even if the members of the Board are state officers the suit is maintainable in the federal courts, because, it is said, the Board acted in excess of its statutory authority. The nubbin of the argument appears to be that the legislative act recognizes vested rights of prior appropriators, and that the Board invaded appellee's rights merely by making an appropriation of water and by taking steps looking toward the erection of a diversion dam. However, the act specifically authorizes the making of appropriations and the construction of works. There was no presumption at the outset that in pursuing the program outlined for it by the legislature the Board would violate prior rights.[4] The injunctive relief sought was supplemental to the main purpose of the action, which was to quiet appellee's title to the waters of the river. This suit is not typical of those relied on by appellee where the relief asked for was injunction against the commission by state officials of specific wrongful acts.[5] In any event the act itself afforded appellee an adequate remedy for any actual invasion of its rights. Section 349.22 thereof provides that "the owner of any prior right contending that the board is not recognizing and respecting such appropriation may resort to a court of equity for the purpose of determining whether or not the rights of said claimant have been invaded and the board shall observe the terms of such final decree."

The judgment is reversed and the cause remanded with directions to dismiss as against the State Water Conservation Board and its members.

DENMAN, Circuit Judge (dissenting).

On the question of diversity of corporate citizenships, the majority opinion is in conflict with the decision of the Fifth Circuit in Louisiana Highway Commission v. Farnsworth, 74 F.2d 910, 912, 913,[1] certiorari denied 294 U.S. 729, 55 S.Ct. 638, 79 L.Ed. 1259, and with the Supreme Court decision of Port of Seattle v. Oregon & W. R. Co., 255 U.S. 56, 41 S.Ct. 237, 65 L.Ed. 500.

These and other cases establish the law to be that where a state creates separate corporate entities as its agents to perform governmental functions and gives such corporate entities the right to sue and be sued and the state's Supreme Court, construing the laws creating such corporations, determines that the Legislature has created the corporations to be such separate entities, they are citizens of the creating state subject to be sued in the federal courts by a citizen of another state. The Water Conservation Corporation is such a separate entity.

Appellants' brief contends that a corporation cannot be a citizen. Before the extended analysis, infra, of the Political and Military Codes of Montana and cases construing their provisions, in disagreement with the equally extended analysis of the majority opinion, it seems proper to comment on the legal fiction which requires such judicial effort on the part of the writer's associates and himself.

The state, an entity with governmental functions, and a political embodiment of all its citizens, is not a citizen and cannot sue

---

described by the court as a municipal corporation exercising, among others, "powers similar to those exercised by counties."

[4] That appellee's rights were not per se invaded by the enterprise in question is shown by the fact that the Board's project was completed during the course of the trial and water was diverted from the river during the 1941 irrigation season, concededly without interfering with appellee's prior rights. Indeed it was found that with the exception of the months of July and August the flow of the Missouri has normally been more than sufficient to supply appellee's requirements.

[5] The authorities cited by appellee are: Weiland v. Pioneer Irr. Co., 8 Cir., 238 F. 519, affirmed 259 U.S. 498, 42 S. Ct. 568, 66 L.Ed. 1027; Magruder v.

Belle Fourche Valley Water Users' Ass'n, 8 Cir., 219 F. 72; Mitchell Irr. Dist. v. Sharp, 10 Cir., 121 F.2d 964; Tyler v. Stanolind Oil & Gas Co., 5 Cir., 77 F.2d 802, certiorari denied Allred v. Stanolind Oil & Gas Co., 296 U.S. 627, 56 S.Ct. 149, 80 L.Ed. 445; Id., 296 U.S. 663, 56 S.Ct. 169, 80 L.Ed. 472; Tindal v. Wesley, 167 U.S. 204, 17 S.Ct. 770, 42 L. Ed. 137; Hopkins v. Clemson Agricultural College, 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890, 35 L.R.A.,N.S., 243; Lane v. Watts, 234 U.S. 525, 34 S.Ct. 965, 58 L.Ed. 1440; Payne v. Central Pac. R. Co., 255 U.S. 228, 41 S.Ct. 314, 65 L. Ed. 598.

[1] Distinguishing an earlier Fifth Circuit case, Kansas City Bridge Co. v. Alabama State Bridge Corp., 59 F.2d 48, on which the majority relies.

or be sued as such and thereby establish the diversity jurisdiction. Postal Tel. Cable Co. v. State of Alabama, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231; 28 U.S.C.A § 41(1). Yet it may incarnate itself into a corporate creature exercising only the state's governmental functions and which, though it cannot vote, procreate as a human mammal, bleed in battle for its country's defense, or hang for treason against her, by a legal fiction is, in effect, a citizen for the purpose of creating the diversity jurisdiction. Certainly such an incarnation would have seemed monstrous to the men framing the Constitution if it had been suggested that this was the "citizen" of which they were thinking when they enacted Article III, sec. 2, clause 1 of the Constitution. It so seems to the writer of this opinion, whose views are better expressed in Professor McGovney's review in the Harvard Law Review of May 1943, at page 853.

Equally astounding to the framers of the Constitution would have seemed the more recent results of the application of the fiction to private corporations. The records of Director Chandler of the Administrative Office of the United States Courts show that in the fiscal year 1942 there were 2,083 cases terminated in the federal District Courts which had been removed from the state courts by corporate defendants on the ground of diversity of citizenship. This is 52-plus percent of the 3,864 cases there terminated in that year in which the federal jurisdiction was based upon a corporate citizenship.

In this circuit, and no doubt elsewhere, corporate defendants use the fiction to transfer cases from the state courts, where their opponents are entitled to verdicts on votes of eight, nine or ten jurors,[2] to the unanimous vote of the federal tribunals. Many more than those so transferred are those unjustly settled under the pressure of the threat of transfer from the lesser jury vote of the state courts of the vicinage to the distant federal courts, often requiring a change or addition of counsel and always the expense of travel of parties and witnesses and the discomfort of living away from home.

In more recent years in the metropolitan centers, the smaller neighborhood stores in which the housewife markets and shops have become parts of chains of stores owned by foreign corporations, of which the prof-

its of such homely local transactions are their sole objectives. As was humorously stated by Judge Yankwich, "A woman slips on a banana peel in a corner grocery and lands in the federal court." In the particular situation of the judge's jest, her nine-vote jury would be sitting in the state court house less than a block away. The wrong done her would be all in a very parochial setting; only distant is the distribution of the corporate dividends, all, quite likely, to the citizens of the same state living on the more pretentious streets of the same city. Cf. Bank of United States v. Deveaux, 5 Cranch, 61, 91, 3 L.Ed. 38.

It seems clear that, in a very profound sense, the litigant dragged by the foreign corporation from a nine-vote jury to a unanimous jury is as much denied the "equal protection of the law" as he was in his removal from the common law of the state to the federal "general commercial law" of Swift v. Tyson, 16 Pet. 1, 18, 10 L. Ed. 865. All that was said in Erie R. Co. v. Tompkins, 304 U.S. 64, 75, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, about the fiction of a federal general law applies to the corporate citizen fiction in diversity cases. Indeed the argument for a federal commercial law has more respectable support than the legal absurdity of the holding that, though a stockholder in no way is a party to his corporation's contract, nevertheless, in a suit against the corporation on the contract, the corporation is not being sued but all its stockholders against none of whom can plaintiff have judgment. Marshall v. Baltimore & O. R. Co., 16 How. 314, 14 L.Ed. 953.

There is practically no difference in antiquity of the two fictions, that is the century and one year back of Swift v. Tyson and the ninety-five years back to Louisville, C. & C. R. Co. v. Letson, 2 How. 497, 11 L.Ed. 353. Hence the passage of time no more stands in the way of restoring to wronged litigants the equal protection of the law in the one case than in the other. As stated of the fiction of a federal general commercial law in Erie R. Co. v. Tompkins, supra, 304 U.S. at page 79, 58 S.Ct. 823, 82 L.Ed. 1188, 114 A.L.R. 1487, the doctrine of corporate citizenship is "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct."

---

[2] Montana 8 votes; California, Oregon and Idaho 9 votes; Washington 10 votes.

Unfortunately, this court must consider the surviving fiction as a fact.

The statute creating the State Water Conservation Board made it "a body corporate and politic," and "a board to be known as the 'state water conservation board,' and by that name the board may sue and be sued, plead and be impleaded, and contract and be contracted with." Revised Statutes of Montana, 1935, Political Code §§ 349.23, 349.3.

The sole question decided by the majority is whether this Montana corporation has a corporate existence separate and apart from the state and is not merely a group of state officers exercising state functions. If it has such a separate corporate existence it has the requisite corporate citizenship to remove it from the prohibition of the Eleventh Amendment under the decisions in Port of Seattle v. Oregon & W. R. Co., 255 U.S. 56, 58, 71, 41 S.Ct. 237, 65 L. Ed. 500; Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766, and Chicot County v. Sherwood, 148 U.S. 529, 13 S.Ct. 695, 37 L.Ed. 546.

The fact that the corporation exercises, as an agent of the state, governmental functions over various stream and river waters located in different parts of the state is not controlling. Montana created the Montana Armory Board, a "body politic and corporate," in a part of that state's Military Code[3] as a state agency "to foster and build armories" in the State of Montana, that is to exercise one of the highest functions of any state—the providing of armories in all parts of the state, from which will be gathered the soldiers for an army of the state to protect its citizens as a whole or those requiring protection in various localities. Immediately upon the building of the various armories, the state acquired the exclusive property right therein to lease them (§ 1400.4(g). Only on non-payment of the rental reserved could they be leased to anyone else. Such a state agency is held by the Montana Supreme Court to be a "public corporation separate and apart from the

state." Geboski v. Montana Armory Board, 110 Mont. 487, 492, 103 P.2d 679, 682.

The corporation of the Port of Seattle had delegated to it the state's control over the flow of goods of shippers and consignees of the greater part of the production of Washington's farms and industries which pass over its waterfront,[4] of its principal port, a waterfront owned by the state and not by the corporation. Nevertheless, in a suit involving the exercise of that function by such a state agency and that control over state property it was held to be a corporate citizen of Washington suable by a corporate citizen of Oregon in the United States District Court for the Western District of Washington. Port of Seattle v. Oregon & W. R. Co., supra.

The very subject matter of the instant appeal shows the necessity that the corporation be deemed an entity apart from the state. Though a state agency, as are all political corporations exercising the functions delegated to them, here the corporation is to deal with the state in a separate and adversary function. It is to acquire title from the state as its grantee of property of which it is to continue to hold the title for the benefit not of the state but for private persons.

The suit is to quiet title to certain properties called water rights, acquired by appropriation from the state, in waters in certain of its many streams and rivers. Under the law of Montana such water, coming from the skies above, is the property of the State of Montana. "* * * the state of Montana has by necessary implication assumed to itself the ownership, sub modo, of the rivers and streams of this state, and, by section 1880 et seq. of the Civil Code, has expressly granted the right to appropriate the waters of such streams, which right, if properly exercised in compliance with the requirements of the statutes, vests in the appropriator full legal title to the use of such waters by virtue of *the grant made by this state as owner of*

3 Montana Military Code, Revised Codes of Montana, Supp.1939 § 1400.49.

4 The Supreme Court's decision in a footnote on page 58 of 255 U.S., 41 S. Ct. at page 238, 65 L.Ed. 500, of the Port of Seattle case quotes the following powers conferred on the corporation by the Washington statutes:

" 'to create and improve for harbor purposes new waterways within the port district; *to regulate and control all such waters * * * within the limits of such port district so far and to the full extent that this state can' and hereby does 'grant the same,* and remove obstructions therefrom; to straighten, widen, deepen and otherwise improve any and all waters; * * *.' " (Emphasis supplied.)

*the water.* * * *" (Emphasis supplied.) Smith v. Denniff, 24 Mont. 20, 21, 60 P. 398, 50 L.R.A. 737, 81 Am.St.Rep. 408.

It is an ownership in the water which begins when the rain or snow falls on the state and terminates when the water flows out of the state. It is not unlike the state property in migratory wild fowl which begins when the fowl fly from the skies into the state and ends when they fly out over its borders.

It is obvious that such ownership of the water is a "bundle of rights," among them its use for irrigation or for power. The title to each and all of these rights is in the state. The state could have declared that it held in trust the right to the use of any local water of a stream or streams for irrigation of the particular lands owned below its flow for the benefit of the particular land users to whom it was available. Likewise the state as such could have acquired and owned land and erected structures on it to store and divert the water to the use of the particular irrigator to whom it could be delivered.

However, Montana chose not to create its irrigation and power enterprises by such a method. Instead of the state retaining its ownership in the water it created a separate corporate entity to *appropriate from it* water rights in certain waters, here for the irrigation of another corporation, an association of land users. The statutory provisions for the corporation's *appropriation from the state,* that is to take a position, in law, necessarily adverse to the state, is

"349.18. Appropriation of waters—recording of notice—date of right. In acquiring the rights and administering the terms of this act herein prescribed and established, the board shall not be limited to the terms of the statutes of the state of Montana relating to water rights heretofore enacted; but, in addition thereto, may initiate a right to the waters of this state by executing a declaration in writing of the intention to store, divert or control the unappropriated waters of a particular body, stream or source, designating and describing in general terms such waters claimed, means of appropriation and location of use, and cause said notice to be filed in the office of the county clerk and recorder of the county where the major portion of the means of diversion or control will be located, *which right shall vest in such board on the date of the filing of such declaration.* * * *" (Emphasis supplied.)

"349.19. Extent of water right of board. *The right of the board to the waters within the state of Montana so acquired as hereinbefore provided* for the purpose defined in this act shall attach at and from their source and while flowing in the stream travelling to the means of control as well as when actually confined by such means. * * *" (Emphasis supplied.) Montana Political Code.

The Montana Supreme Court defines such an appropriation vesting in the appropriator title in the water right as "by reason of a *statutory grant.*" Smith v. Denniff, supra, 24 Mont. at page 24, 60 P. at page 399, 50 L.R.A. 737, 81 Am.St.Rep. 408.

Having thus by grant from the state had vested in the corporation the title to certain water rights, the statute provides that the corporation may add to them other Montana water rights similarly secured by the appropriation of other persons of which it takes "the title" by purchase or condemnation, and also "the title" to land and "other property deemed necessary or proper for the construction, operation and maintenance of such works," (Montana Political Code, § 349.4) that is, here, an establishment for storage and distribution of water for irrigation.

Not only is the corporation to acquire and be vested with title to property within the state, but it is empowered to go outside the state and acquire, by purchase, lands and erect works or appropriate water rights under the laws of such other states.

The statute provides that the moneys for the acquisition of these corporate properties are to come from private sources other than the state or, by later legislation, from the federal government.

The corporation thus having vested in it, by action adversary to the state, the title to certain water rights and having vested in it title to other water rights and land and structures for utilizing the water rights, is empowered to convey to a private person, as trustee, all these properties including the water rights to secure the repayment of moneys borrowed to purchase the water rights and plant. Under such an instrument the corporation "is to retain ownership and control of the project so long as the bonds are outstanding." State v. Cooney, 100 Mont. 391, 396, 47 P.2d 637,

640. On foreclosure the purchaser "shall obtain title to such work or project." Montana Political Code § 349.9. The moneys so borrowed are to be placed in funds created by the corporation and deposited, not in the state treasury, but in "any bank or trust company." Political Code § 349.10.

Here, in addition to the corporation's separation from the state, necessary to become a statutory grantee by its appropriation of water rights from the water owned by the state, are all the indicia of a corporate structure owning and disposing of its own property. It is difficult to see how the separateness of such an agency from the state could be more clearly expressed.

In a broad sense the state, though without liability for the bonds promising to pay the loaned money, may be said to own the property because the corporation, like other political corporations, is its agency, but it has given to the corporation separateness from itself to accomplish the result. Hence, as held by the Montana Supreme Court in State v. Cooney, 100 Mont. 391, 412, 47 P. 2d 637, 648, in determining the legality of a contract for such a project, "Under the plan outlined in the Water Conservation Act and under the contract here attacked, the board will own the project and the water rights acquired for its operation."

As held in Geboski v. Montana Armory Board, supra, such a corporate agency of the state so holding property, there for military purposes as here for irrigation and power, is an entity separate and apart from the state,—not a municipal corporation, but like it in such separateness. The acquisition by the Armory Board for the state of title to armories of which the state becomes at once lessee and ultimately, on their becoming debt free, the owner, is not greater in separateness of political function than the acquisition by grant to the Water Board of the title to water rights which the board "will own" for the benefit of private persons. It seems clear that we are bound by this decision of the Montana court as to the separate corporate character of such a political agency as Montana has created in the Water Conservation Board.

The cases hold that in determining the right to sue a corporation created by the state for the exercise of governmental functions, the court should look to the decisions of the courts of the state to determine the character of the state governmental corporation and will be bound thereby. Since this is the established rule, it is a matter of indifference whether it flow from the comity existing between the federal and the state governments and tribunals or whether, in cases like this, in the nature of a common law suit to try title to property, the state laws are controlling because of 28 U.S.C.A. § 725.

"§ 725. Laws of States as rules of decision. The laws of the several States, except where the Constitution, treaties, or statutes of the United States otherwise require or provide, shall be regarded as rules of decision in trials at common law, in the courts of the United States, in cases where they apply."

In Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766, Lincoln County was held a separate entity despite the delegation of the state's governmental functions to it on the authority of decisions of the Nevada Supreme Court construing the provisions of the Nevada Constitution creating such corporations (133 U.S. at page 532, 10 S.Ct. at page 364, 33 L.Ed. 766). We have seen that the Supreme Court similarly relied on the decision of the Washington Supreme Court in Port of Seattle v. Oregon & W. R. Co., supra. Both these cases decided the corporations were separate entities.

In State Highway Commission of Wyoming v. Utah Const. Co., 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262, the Commission was not a corporation. In holding that it was not acting as a separate suable entity the Supreme Court (278 U.S. at page 199, 49 S.Ct. at page 106, 73 L.Ed. 262) relies on the decisions of the Supreme Court of Wyoming in determining the Commission's suable character.

In this court's decision in Fowler v. California Toll-Bridge Authority, 9 Cir., 128 F.2d 549, Judge Garrecht's opinion was considering the contracting power of the Authority, a nonincorporated body of state officers. In holding that the Commission's contractual obligation was not that of an entity separate from the state, the opinion relies on a decision of the California Supreme Court.

The California Toll Bridge case also relies upon the fact that, unlike the instant corporation which is a statutory grantee from Montana of its water rights, "the title to the property constructed or acquired is in the State of California, and the construction or acquisition is by the state de-

partment of public works, [still another group of state officers] which has full charge of the operation and maintenance of the toll bridges and the collection of tolls thereon." (128 F.2d at page 551.) It is thus seen that Judge Garrecht's opinion in the California Toll Bridge case, on which the majority opinion relies, seems to support the contrary construction.

The Fifth Circuit case of Kansas City Bridge Co. v. Alabama State Bridge Corporation, 59 F.2d 48, also relied upon by the majority, that circuit distinguishes in Louisiana Highway Commission v. Farnsworth, 74 F.2d 910, 913, on the ground that the Louisiana Supreme Court had decided the Highway Commission, a corporation, was suable as such a separate entity and that under the Supreme Court's rule in State Highway Commission v. Utah Const. Co., 278 U.S. 194, 49 S.Ct. 104, 73 L.Ed. 262, it must find that the Louisiana Commission had citizenship.

It seems clear that under Judge Garrecht's criteria, in the California Toll Bridge case and under these other cases, we must consider the Montana decision in the Gebaski case holding separateness in this class of corporations and the separate grantee ownership of the instant corporation's water rights, of which the title is sought to be quieted, and the other statutory attributes of the Water Conservation Corporation, and hold that it has the separateness of corporate entity, to invoke the fiction of diversity of citizenship.

The court should have decided that the District Court has jurisdiction over the controversy. It is with regret that the writer agrees we cannot sustain the appellants' contention that a corporation cannot be deemed a citizen.